# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

C.A. No. 16-1904

ALFRED MORIN,

Plaintiff/Appellant

v.

MARK K. LEAHY; COMMONWEALTH OF MASSACHUSETTS

Defendants/Appellees

ON APPEAL FROM A DECISION OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF OF DEFENDANT – APPELLEE

## TOWN OF NORTHBOROUGH CHIEF OF POLICE MARK K. LEAHY

Brian W. Riley (C.A. No. 14919)
Janelle M. Austin (C.A. No. 1141809)
KP Law, P.C.
  Town Counsel
101 Arch Street, 12th Floor
Boston, MA  02110
(617) 556-0007
briley@k-plaw.com
jaustin@k-plaw.com

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities ........................................................................................iii

Statement of Jurisdiction................................................................................. 1

Statement of Issues Presented for Review ...................................................... 1

Statement of the Case...................................................................................... 2

Statement of Facts .......................................................................................... 3

Summary of the Argument.............................................................................. 6

Argument......................................................................................................... 7

    I.    The District Court Properly Held that the Massachusetts Firearm Licensing Statute, as Applied to Morin by the Chief of Police, Is Constitutional…………………………………………….……….7

        A. The Massachusetts Firearms Licensing Scheme Does Not Ban the Possession of Firearms in the Home……..……………………….8

    II.    Chief Leahy, Acting in His Official Capacity as Chief of Police for the Town of Northborough, Is Entitled to Judgment in His Favor as to Plaintiff Morin's 42 U.S.C. §1983 Claim……………………12

    III.    The District Court's Decision Should be Affirmed Since the Chief of Police is Entitled to Judgment in His Favor As to Morin's Declaratory Judgment Claim…………………………………………20

Conclusion………………………………………………………………22

Addendum…………………………………………….................…………25

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397
(1997) ................................................................................................ 13, 14

Chardin v. Police Comm'r of Bos., 465 Mass. 314 (2013) .................. 10, 11

Chief of Police of the City of Worcester v. Holden, 470 Mass. 845 (2015)
.............................................................................................................. 10

City of Canton v. Harris, 489 U.S. 378 (1989) ........................................... 14

Cunningham Bros., Inc. v. Bail, 407 F.2d 1165 (7th Cir. 1969) .................. 21

Davila-Lynch v. City of Brockton, CIV.A. 09-10817-RGS,
2011 WL 4072092 (D. Mass. Sept. 12, 2011) ............................................ 18

Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir. 1980) .......................... 15

Foley v. City of Lowell, 948 F.2d 10 (1st Cir. 1991) ................................... 14

District of Columbia v. Heller, 554 U.S. 625 ................................ 7, 9, 10, 11

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012).......................... 2, 9

Kentucky v. Graham, 473 U.S. 159 (1985) ................................................. 13

Leahy v. Bd. of Trs., 912 F.2d 917 (7th Cir. 1990) ...................................... 14

Los Angeles Cnty., Cal. v. Humphries, 131 S. Ct. 447 (2010) ....... 18, 19, 21

McDonald v. City of Chicago, 130 S.Ct. 3020 (2010).................... 7, 9, 10, 11

Monell v. Department of Social Services, 436 U.S. 658 (1978) .....................
........................................................................... 13, 16, 16, 18, 19, 20

Murphy v. Police Com'r of Boston, 369 Mass. 469 (1976) ........................ 17

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) .................................. 15

Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015) ................................... 9-10

Snyder v. King, 745 F.3d 249 (7th Cir. 2014) .............................................. 14

Strauss v. City of Chicago, 760 F.2d 765 (7th Cir. 1985) ........................... 14

Surplus Store and Exchange, Inc. v. City of Delphi, 928 F.2d 788
(7th Cir. 1991) ............................................................................................. 15

Whitesel v. Sengenberger, 222 F.3d 861 (10th Cir. 2000) .......................... 15

Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005) ............................ 13

Youngworth v. Com., 436 Mass. 608 (2002) .............................................. 17

Zwetchkenbaum v. Operations, Inc., 165 F. Supp. 449 (D.R.I. 1958) ........ 20

## Statutes and Regulations

42 U.S.C. §1983 ........................................................ 1, 6, 12, 13, 14, 18, 20, 21
42 U.S.C. §1988 ........................................................................................ 19
28 U.S.C. §2201 .............................................................................. 1, 6, 20
D.C. Criminal Code, §22-2304(a)(1) .....................................……4
D.C. Criminal Code, §6-2376 ..................................................................... 4
G.L. c. 140, §131 ............................................................................... 1, 2, 8
G.L. c. 140, §129B ................................................................................. 2, 6

**STATEMENT OF JURISDICTION**

The U.S. District Court for the District of Massachusetts had jurisdiction over plaintiff/appellant's Complaint pursuant to 42 U.S.C. §1983 and 28 U.S.C. §§2201-2201.  (See Joint Appendix, hereinafter ("RA") at 9).

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1. Whether the District Court correctly held that G.L. c. 140, §131(d)(ii)(D) is constitutional as applied to the plaintiff/appellant Alfred Morin ("Morin")'s denial of his Class A license to carry firearms by the Town of Northborough Chief of Police?

2. Whether the Chief of Police[1] can be held liable pursuant to 42 U.S.C. §1983 for his non-discretionary denial of a license to carry firearms dictated by the statutory requirements of G.L. c. 140, §131(d)(ii)(D)?

3. Whether a declaratory judgment ruling is appropriate in this case pursuant to 28 U.S.C. §2201 where a specific remedy afforded pursuant to 42 U.S.C. §1983 can be made regarding the as-applied constitutional challenge by Morin?

## STATEMENT OF THE CASE

On March 25, 2015, Morin filed a Complaint against the Chief of Police of the Town of Northborough.  (RA, 8-16).  In the Complaint, Morin alleges that the Chief of Police's denial of his license to carry firearms due to a mandatory statutory disqualification violated his Second Amendment rights.  (RA, 15-16).  Morin sought declaratory and injunctive relief barring the Chief from refusing to issue a license to carry firearms under G.L. c. 140, §131(d)(ii)(D).  (RA, 15).

Given Morin's allegation that Massachusetts law, G.L. c. 140, §§131, 129B, was unconstitutional, on August 12, 2015, the Attorney General's Office moved to intervene in the case.[2]  (Docket Entry 15).  After a brief period of discovery, the parties all moved for summary judgment.  (Docket Entries 21-29).  After a hearing on the briefing, on May 18, 2016, the District Court denied Morin's Motion for Summary Judgment and granted the Commonwealth and Chief of Police's Motions for Summary Judgment.  (Docket Entry 41).  Morin filed a Motion to Amend or Alter the Judgment, which was opposed, and ultimately denied on June 30, 2016.

---

[1] Mark Leahy previously served as the Chief of Police of the Town of Northborough until 2016.  For purposes of this Brief, he will be referred to as "Chief Leahy" or "Chief of Police."

[2] Morin has not alleged that he has applied for a firearms identification card pursuant to G.L. c. 140, §129B, and thus, has no standing to challenge its constitutionality.  Hightower v. City of Boston, 693 F.3d 61, 70-71 (1st Cir. 2012).

2

(Docket Entries 43-46).  On July 1, 2016, Morin filed a Notice of Appeal.  (Docket

Entry 47).

Morin has only appealed the District Court's decision on his as-applied

challenge to the Chief's decision under the Second Amendment.  (Appellant's

Brief, p. 13).

## STATEMENT OF FACTS

I.    Morin's Criminal and Firearms Licensing Background

The Commonwealth issued Morin a Class A license to carry firearms in

1985.  (RA, 28).  Morin held the Class A firearms license until its expiration in

2008.  (RA, 28).  In the interim, Morin was convicted of several firearms related

offenses in Washington D.C. (RA, 48).

In October 2004, Morin drove across numerous state lines, from

Massachusetts to Washington, D.C. to visit his daughter.  During the trip, he

carried his loaded pistol, a Colt Pocket Lite, which was only licensed in

Massachusetts and five rounds of .380 ammunition.  Despite being licensed to

carry a firearm since 1985, Morin asserts that he was unaware in 2004 that his

Massachusetts firearms license was not recognized in Washington, D.C.  (RA, 28-

29).

Then, while in Washington, D.C., Morin went to the Smithsonian Museum

of Natural History.  (RA, 28, 44).  During the visit, he realized that firearms were

banned at the museum.[3]  (RA, 44).  Morin inquired at security whether he could

check his firearm.  (RA, 44).  Due to safety concerns and Morin's prohibited

conduct, the security officer contacted police, who arrested Morin.  (RA, 44).

District of Columbia police charged him with carrying a firearm without a license,

possession of an unregistered firearm and unlawful possession of ammunition.

(RA, 48).   In turn, Morin pled guilty to attempting to carry a pistol without a

license, in violation of D.C. Criminal Code, §22-2304(a)(1), and possession of an

unregistered firearm in violation of D.C. Criminal Code, §6-2376.  (RA, 48).   As a

result of his guilty plea, he was sentenced to sixty (60) days in prison on each

count, such sentences to run concurrently.  Morin was also sentenced to three

months of supervised probation and twenty (20) hours of community service.  The

prison sentence was suspended.  (RA, 48).

    II.    The Chief of Police's Non-Discretionary Denial of Morin's License to
           Carry Based on the Existence of a Mandatory Statutory
           Disqualification Under G.L. c. 140, §131(d)(ii)(D)

    Following the 2004 criminal conviction, in February 2008, Morin applied to

the Town of Northborough to renew his previously expired Class A license to

---

[3] The carrying of firearms in the absence of law enforcement credentials, <u>even with
a valid firearms permit</u>, is specifically prohibited at the Smithsonian Institution.
Indeed, the Smithsonian prohibits carrying "firearms, other dangerous or deadly
weapons, or explosives, either openly or concealed on the premises…"  Such
information is readily available to members of the public online at:
http://www.si.edu/Visit/Security.

4

carry. (RA, 32-34). The license to carry firearms renewal form required him to answer, under oath, whether he had "in any state or federal jurisdiction" been convicted of a "violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons for which a term of imprisonment may be imposed." (RA, 33). Untruthfully, Morin answered "no." (RA, 33, Question 7). As part of the required criminal background check, the Northborough Police Department ran a fingerprint check, which then revealed his prior convictions for firearms related offenses. (RA, 39). As a result of these convictions, which serve as statutory disqualifiers pursuant to G.L. c. 140, §131(d)(ii)(D), after consultation with the state's Firearms Records Bureau, the Chief of Police was required to deny Morin's license to carry firearms. (RA, 37).

Thereafter, in February 2015, Morin re-applied to the Northborough Police Department for a Class A License to Carry. During the application process in 2015, as opposed to 2008, Morin disclosed that he had prior convictions for firearms related offenses. (RA, 41-43). Since Morin was convicted of firearms related offenses, which, as noted supra, serve as a statutory bar to hold a license to carry firearms under G.L. c. 140, §131(d), the Chief of Police was required by the Firearms Records Bureau to again deny the license. (RA, 52). Specifically, the statute provides, in relevant part, that an individual may not hold a Class A license to carry if they are a "prohibited person." G.L. c. 140, §131(d)(ii)(D). A

5

"prohibited person" includes an individual who "has, in any other state or federal jurisdiction, been convicted…for the commission of…a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed."  G.L. c. 140, §131(d)(ii)(D).  Such statutory disqualifier is non-discretionary and not based on a "suitability" determination by the Chief of Police.  Id.

Following the denial of said Class A License to Carry, Morin filed suit against Chief Leahy challenging the constitutionality of the Massachusetts firearms licensing statute, G.L. c. 140, §§129B(1)(i)(D), 129B(1)(ii)(D) and 131(d)(ii)(D). (RA, 8-16).

## SUMMARY OF THE ARGUMENT

The District Court correctly held that Morin failed to establish that the Chief of Police's denial of his license to carry firearms pursuant to a mandatory statutory disqualifier pursuant to G.L. c. 140, §131(d)(ii)(D) violated his Second Amendment Rights.  (pp.7-12).  Further, Morin failed to establish a violation of 42 U.S.C. §1983 against the Chief of Police for his non-discretionary denial of Morin's license to carry firearms, which was required by the Commonwealth of Massachusetts pursuant to state law, G.L. c. 140, §131(d)(ii)(D).  (pp.12-20). Lastly, the District Court's decision should be affirmed since Morin has not

established that he is entitled to declaratory relief against the Chief of Police

pursuant to 28 U.S.C. §2201.  (pp. 20-21).

## ARGUMENT

I.  <u>The District Court Properly Held that the Massachusetts Firearm Licensing
Statute, as Applied to Morin by the Chief of Police, Is Constitutional</u>[4]

As the District Court properly held, Chief Leahy's denial of Morin's 2015

Class A License to Carry was wholly proper since G.L. c. 140, §131, as applied to

Morin, is constitutional.[5]  The U.S. Supreme Court's holdings in <u>Heller</u> and

<u>McDonald</u> do not require the invalidation of statutes that require a license to

purchase or possess a firearm.  To the contrary, the U.S. Supreme Court in <u>Heller</u>

and <u>McDonald</u> specifically held that statutes completely banning handgun

possession in the *home* violate the Second Amendment.  Neither the

Commonwealth of Massachusetts nor the Town of Northborough has such a

statutory scheme, thus the Chief's decision does not run afoul of the Second

---

[4] For purposes of this appeal, the Chief of Police further relies on the arguments set
forth in the Commonwealth's brief regarding the constitutionality of the
Massachusetts firearms licensing statute, G.L. c. 140, §131, since the
Commonwealth has moved to intervene in this case to defend its statutory scheme.
[5] It is also the Town of Northborough and Chief Leahy's position that they should
not be held responsible for any award of attorneys' fees or costs that may be
imposed by the Court since the Attorney General's office moved to intervene in
this case and, as a result, as a party to this case, is ultimately responsible for
defending the constitutionality of the statute that governed the Town and Chief
Leahy's non-discretionary actions.

Amendment.

    A. <u>The Massachusetts Firearms Licensing Scheme Does Not Ban the Possession of Firearms in the Home</u>

    Through its regulation of firearms, the Commonwealth of Massachusetts has not banned the use of firearms in the home for self-defense. Contrary to Morin's sweeping assertions outlined in his Brief, the Legislature has adopted a reasonable statutory scheme which prohibits local licensing authorities, such as the Chief of Police, from issuing firearms to individuals with certain, specifically enumerated statutory disqualifiers. The Legislature has taken such actions in recognition of established interests of public safety. (RA, 55-114).

    Massachusetts General Laws requires a local firearms licensing authority, the Chief of Police, to deny a Class A license to carry based on the existence of any specifically enumerated statutory disqualifiers. <u>See</u> G.L. c. 140, §131(d)(ii)(D).[6] Specifically, G.L. c. 140, §131(d)(ii), the statute at issue in this appeal, includes the following mandatory, non-discretionary disqualifications[7]:

> [an individual is a prohibited person if he/she] has, in any other state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment for more than 2 years; (C)

---

[6] The District Court properly concluded that Morin lacked standing to challenge the constitutionality of G.L. c. 140, §131(d)(i)(D) since he was not convicted of a firearms related charge in the Commonwealth.

[7] As noted *supra*, such statutory disqualifications are statutorily distinct from the discretionary "suitability" decisions pursuant to G.L. c. 140, §131(d).

a violent crime as defined in section 121; (D) <u>a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed;</u> (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in said section 1 of said chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U. S. C. 921(a)(33).  [emphasis supplied].

Given the significant and broad-reaching public safety issues at stake, as the District Court correctly concluded, the Court should apply this Court's prior holding in <u>Hightower</u>, affording the proper deference to the limited holdings of <u>Heller</u> and <u>McDonald</u>, which expressly permit valid firearms regulation—such as those that currently exist in the Commonwealth.  As is now well-established in firearms jurisprudence, the Supreme Court expressly qualified its holding in <u>Heller</u> as follows, "[l]ike most rights, the right secured by the Second Amendment is not unlimited, and

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools <u>and government buildings</u>, or laws imposing conditions and qualifications on the commercial sale of arms. [emphasis supplied].

<u>Heller</u>, 554 U.S. at 625.  The Supreme Court identified these restrictions as "presumptively lawful regulatory measures," and held that they were only "examples" and not exhaustive of the potential for regulatory restrictions.  <u>Heller</u>, 554 U.S. at 626-27, fn 26.  As this Court held in <u>Powell</u> v. <u>Tompkins</u>, 783 F.3d

9

332, 347 (1st Cir. 2015), <u>Heller</u> and <u>McDonald</u> establish that states may not

impose legislation that works as "a complete ban on the possession of operable

handguns in the home by <u>law-abiding</u>, responsible citizens for use in immediate

self-defense." [emphasis supplied].

Significantly, in interpreting the Massachusetts firearms licensing scheme

pursuant to the Supreme Court's holding in <u>Heller</u>, the Massachusetts Supreme

Judicial Court has upheld the validity of G.L. c. 140, §131.  <u>See, e.g.</u> <u>Chief of</u>

<u>Police of the City of Worcester</u> v. <u>Holden</u>, 470 Mass. 845, 853-854 (2015)(citing

<u>Heller</u>, 554 U.S. at 635; <u>Chardin</u> v. <u>Police Comm'r of Bos</u>., 465 Mass. 314, 327

(2013).  Notably, in <u>Chardin</u>, the Supreme Judicial Court unambiguously

recognized the scope of reasonable statutory restrictions imposed by the

Legislature as follows:

> In conformity with our discussion of the constitutional framework of
> this case, we conclude that § 131 (<u>d</u>) (i) does not burden conduct that
> falls within the scope of the Second Amendment. To the contrary, the
> statute embodies a long-standing and well-recognized prohibition on
> the possession of firearms by a particular group of individuals -- those
> who have committed a felony -- and is clearly encompassed within the
> "presumptively lawful regulatory measures" that <u>Heller</u> has declared
> to be outside the ambit of the Second Amendment.

> <u>Id.</u>  (citing <u>Heller</u>, <u>supra</u> at 626-627 & n.26).

In this case, while the Chief of Police, pursuant to his statutory licensing

responsibility, certainly adheres to all applicable law, including the Second

Amendment, there is no outright ban on firearms at issue in this case as in <u>Heller</u> and <u>McDonald</u>. Morin is simply prohibited from receiving a license to carry since he violated criminal firearms laws. (RA, 39, 46). Indeed, the Chief is merely following the Legislature's statutory mandates, which have been legislatively enacted to ensure public safety related to the licensure of firearms. The Legislature has not banned the use of firearms in the home for self-defense. <u>See</u> G.L. c. 140, §131. Given that the Legislature has determined that individuals who have previously been convicted of firearms related offenses in the Commonwealth and in other jurisdictions are no longer permitted by statute to hold Class A licenses to carry large capacity firearms, there is no Second Amendment violation at issue in the case. <u>Heller</u>, <u>supra</u> at 625. Indeed, as the Supreme Judicial Court has held, which is applicable with respect to Morin's license application, the firearms statute "embodies a long-standing and well-recognized prohibition on the possession of firearms by a particular group of individuals…and is clearly encompassed within the 'presumptively lawful regulatory measures' that <u>Heller</u> has declared to be outside the ambit of the Second Amendment." <u>Chardin</u>, 465 Mass. at 327 (citing <u>Heller</u>, <u>supra</u> at 626-627 and n.26). Therefore, pursuant to the explicit holdings of <u>Heller</u> and <u>McDonald</u>, G.L. c. 140, §131(d)(ii)(D) is constitutional as applied to Morin and the District Court's decision should be affirmed on this basis.

Further, contrary to Morin's assertions in his Brief (pp. 22-25), the Court

should not take into "consideration" his exemplary life, in interpreting whether the denial of his license to carry was valid.  To do so would contravene the Legislature's intent and require each Chief of Police and/or reviewing Court to delve into a purely subjective analysis of each allegedly aggrieved individual to assess the applicability of a wholly <u>objective</u> licensing standard that the Legislature has determined constitute the most concerning criteria for potential future harm. Therefore, there has been no constitutional violation as applied to Morin, and thus the District Court's decision should be affirmed.

II.  <u>Chief Leahy, Acting in His Official Capacity as Chief of Police for the Town of Northborough, Is Entitled to Judgment in His Favor as to Plaintiff Morin's 42 U.S.C. §1983 Claim.</u>

The District Court properly granted summary judgment in favor of the Chief of Police relative to the non-discretionary denial of Morin's license to carry pursuant to 42 U.S.C. §1983.  In this case, Morin claims that the Town of Northborough's Police Chief violated his Second Amendment rights in denying his license to carry based on an explicit statutory disqualifier set forth in G.L. c.140, §131(d)(ii)(D) resulting from his conviction for a firearms related offense.  (RA, 14).  In the Complaint, Morin seeks declaratory and injunctive relief and attorneys' fees against Chief Leahy pursuant to 42 U.S.C. §1983.  (RA, 15-16).  Morin has named Chief Leahy in his official capacity only, setting forth no claims against him in his individual capacity.  (RA, 8).  Therefore, the Section 1983 claims

against Chief Leahy in his official capacity should be treated as a claim against the

Town, <u>Kentucky</u> v. <u>Graham</u>, 473 U.S. 159, 166 (1985), and such claims fail

against Chief Leahy as a matter of law since Morin has failed to establish that his

injury was caused by a <u>municipal</u> policy or custom so as to state a viable claim

under <u>Monell</u> v. <u>Department of Social Services</u>, 436 U.S. 658, 691 (1978) ("a local

government may not be sued under §1983 for an injury inflicted solely by its

employees"); <u>Board of the County Comm'rs</u> v. <u>Brown,</u> 520 U.S. 397, 403 (1997)

(governmental entity "may not be held liable under §1983 solely because it

employs a tortfeasor").

   To establish liability on the part of the Chief, Morin must satisfy two basic

elements: first, that he was harmed by a constitutional violation[8]; and second, that

the Town was responsible for that violation through something more than mere

<u>respondeat superior</u>.  <u>Young</u> v. <u>City of Providence</u>, 404 F.3d 4, 25-6 (1st Cir. 2005).

It is well-settled that, to establish municipal liability under <u>Monell</u>, the plaintiff

must show that the alleged municipal custom or policy was the "moving force"

behind the "particular deprivation" of which he is complaining.  "It is not

enough for a §1983 plaintiff merely to identify conduct properly attributable to the

municipality.  The plaintiff must also demonstrate that, through its deliberate

conduct, the municipality was the moving force behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Bd. of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997); see also Foley v. City of Lowell, 948 F.2d 10, 14 (1st Cir. 1991).

Whether or not a plaintiff has stated a Section 1983 claim against a municipal entity typically hinges on the extent to which that municipal entity was independently responsible for the allegedly unconstitutional act.  See Snyder v. King, 745 F.3d 242, 247 (7th Cir. 2014).  In answering that question, courts have focused on whether "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989); Leahy v. Bd. of Trs., 912 F.2d 917, 922 (7th Cir.1990) ("[p]roximate causation between the municipality's policy or custom and the plaintiff's injury must be present") (quoting Strauss v. City of Chicago, 760 F.2d 765, 767 (7th Cir.1985)).  As the Seventh Circuit Court of Appeals has held:

> When state law unequivocally instructs a municipal entity to produce binary outcome X if condition Y occurs, we cannot say that the municipal entity's 'decision' to follow that directive involves the

---

[8] As discussed supra, Chief Leahy further asserts that the plaintiff has not adduced any evidence that the Massachusetts Firearms Licensing Statute, G.L. c.140, §131, is unconstitutional as a matter of law.

> exercise of any meaningful independent discretion, let alone final
> policymaking authority. It is the statutory directive, not the follow-
> through, which causes the harm of which the plaintiff complains.

Snyder, 745 F.3d at 249. To attach municipal liability, an municipal official, such

as the Chief of Police, must also be responsible for establishing final government

policy respecting such activity before the municipality can be held liable. Pembaur

v. City of Cincinnati, 475 U.S. 469, 482-483 (1986).

"To say that any such direct causal link exists when the only local

government 'policy' at issue is general compliance with the dictates of state law is

a bridge too far; under those circumstances, the state law is the proximate cause of

the plaintiff's injury." Id.; Surplus Store and Exchange, Inc. v. City of Delphi, 928

F.2d 788, 791–92 (7th Cir.1991)("[i]t is difficult to imagine a municipal policy

more innocuous and constitutionally permissible, and whose causal connection to

the alleged violation is more attenuated, than the 'policy' of enforcing state law. If

the language and standards from Monell are not to become a dead letter, such a

'policy' simply cannot be sufficient to ground liability against a municipality");

Whitesel v. Sengenberger, 222 F.3d 861, 872 (10th Cir.2000) (county cannot be

liable for "merely implementing" a policy created at the state level); Familias

Unidas v. Briscoe, 619 F.2d 391, 404 (5th Cir.1980) (municipal entity cannot be

held liable for simply enforcing state law because the municipal policy in that

instance "may more fairly be characterized as the effectuation of the policy of the

15

State ... embodied in that statute, for which the citizens of a particular county should not bear singular responsibility").

In this instance, the Chief of Police, as the duly authorized firearms licensing agent for the Town of Northborough pursuant to state law, cannot be held liable under Monell since there is no evidence that the act complained of—the mandatory denial of Morin's Class A license to carry firearms—is the result of any Town of Northborough policy or custom. In denying Morin's license to carry application, neither the Town of Northborough nor Chief Leahy was following any custom or policy of the Town. Rather, the Chief's non-discretionary decision denying Morin's license to carry was solely dictated by state law, G.L. c.140, §131, in consultation with and direction from the state Firearms Records Bureau. (RA, 37).

Upon receipt of a license to carry firearms application, Chief Leahy is obligated to run a state and national criminal background check on firearms applicants and then he is required to deny any license for which the applicant is statutorily disqualified. (RA, 37). In this regard, the mandatory background check conducted on Morin revealed that he had been convicted of a firearms offense in October 2004 in Washington D.C. following his unlawful decision to transport a firearm across state lines and enter a federal building, the Smithsonian's American Museum of Natural History, with a firearm resulting in a sentence of 180 days. (RA, 39). Specifically, Morin pled guilty to carrying a pistol without a license,

16

possession of unregistered ammunition and possession of an unregistered firearm. (RA, 48).  He was, therefore, not qualified by the state to obtain the license for which he applied.  G.L. c.140, §131(d)(ii)(D).  Under the statutory mandates set forth in G.L. c.140, §131, as established by the Legislature, the Chief of Police has (and continues to have) absolutely <u>no</u> discretion or choice as to whether or not to grant or deny a license to carry if an individual has a statutory disqualifier.  <u>See</u> G.L. c.140, §131(d)(ii) (outlining when a License to carry must be denied by a local licensing authority).  Therefore, the District Court's decision should be affirmed and Chief Leahy is entitled to summary judgment as a matter of law.

Further, to the extent that Morin contends that it is unfair to deny him a firearms license based on a conviction for a firearms related offense in Washington D.C. following a plea deal, his avenue of appeal is to the Legislature, not the courts, since the state Firearms License Board in Boston (a state agency) will not approve a license application if there is a current statutory disqualification.  <u>See</u> RA 37; <u>Murphy</u> v. <u>Police Com'r of Boston</u>, 369 Mass. 469, 471 (1976) (statute authorizing appeal of chief's management decisions "is specific and clear.  If it is unwise, it is not for us to say so; the remedy lies with the Legislature"); <u>see also</u> <u>Youngworth</u> v. <u>Com.</u>, 436 Mass. 608, 612-13 (2002).  Consequently, even if the Town of Northborough through the Police Chief wanted to issue Morin a license, it is unable to do so under current Massachusetts law.

17

Finally, to the extent Morin attempts to circumvent the explicit mandates of

Monell by asserting that Monell is inapplicable to a claim seeking only equitable or

declaratory relief, such claim is futile.  The Supreme Court has held that a

municipality may face liability only for its own policies or customs that result in

constitutional injury and whether an act or omission can be attributed to a

municipality does not depend on the form of relief sought.  Los Angeles Cnty.,

Cal. v. Humphries, 131 S. Ct. 447, 451-453 (2010) ("[t]he language of §1983 read

in light of *Monell's* understanding of the legislative history explains why claims

for prospective relief, like claims for money damages, fall within the scope of the

'policy or custom' requirement").  This circuit has also recognized this principle.

Davila-Lynch v. City of Brockton, CIV.A. 09-10817-RGS, 2011 WL 4072092 (D.

Mass. Sept. 12, 2011) (citing Humphries "[t]his principle is as true of injunctive

and declaratory relief as it is of money damages").

In Humphries, the Supreme Court evaluated whether the "policy or custom"

requirement also applies when plaintiffs seek prospective relief, such as an

injunction or declaratory judgment.  Id. at 449.  Specifically, the plaintiffs were

accused of child abuse in California but later exonerated.  Despite their

exoneration, under California law, their names were added to a Child Abuse

Central Index, where they remained visible to various state agencies for a

minimum of ten years.  Id.  The statute did not set forth any procedure to review

whether a previously filed report was unfounded or allow individuals to challenge

their inclusion in the Index.  Id.  Following their exoneration, the plaintiffs sought

to have their names removed from the Index, but the Los Angeles Sheriff's

Department refused.  Id.  As a result, they filed suit against the Attorney General of

California, the Los Angeles Sheriff's Department, two detectives in the Sheriff's

Department and the County of Los Angeles[9] for damages and injunctive relief.  Id.

at 449-450.  During the litigation, Los Angeles argued that it was a state policy, not

a county policy that brought about the plaintiffs' deprivation.  Id. at 451.[10]

        In reversing the Ninth Circuit Court of Appeals decision, the Supreme Court

held that the Monell standard applies to Section 1983 claims against municipalities

for prospective relief as well as to claims for damages.  Id. at 451.  The Supreme

Court also rejected any relief-based bifurcation, and reasoned that Monell's "logic

also argues against any relief-based bifurcation…[t]he 'policy or custom'

requirement rests upon that distinction and embodies it in law.  To find the

requirement inapplicable where prospective relief is at issue would undermine

Monell's logic."  Id. at 453.  Indeed, the Supreme Court held that "applying

Monell's requirement to prospective relief claims will leave some set of ongoing

---

[9] The county of Los Angeles is a municipal entity.

[10] Los Angeles also argued, as does the Chief of Police in this case, that he is not
responsible for attorneys' fees under 42 U.S.C. §1988.  Humphries, 131 S.Ct. at
450.

constitutional violations beyond redress" and expressly held that <u>Monell</u>'s "policy or custom" requirement applies in Section 1983 cases irrespective of whether a party seeks monetary damages or prospective relief.  <u>Id.</u> at 453-454.

As such, it is axiomatic that the Chief of Police is not liable to Morin under <u>Monell</u> since there was no "policy or custom" of the Town of Northborough that caused Morin to be deprived of a federal right.  Chief Leahy, acting as the Town's firearms licensing authority, merely complied with the Commonwealth's non-discretionary statutory mandates in G.L. c.140, §131(d)(ii)(D).  Therefore, since there are no facts to support Morin's Section 1983 claim for relief against the Chief of Police, the District Court's decision should be affirmed for this additional reason.

III. <u>The District Court's Decision Should be Affirmed Since the Chief of Police Is Entitled to Judgment in His Favor As to Morin's Declaratory Judgment Claim.</u>

To the extent that Morin asserts that he does not need to meet the <u>Monell</u> custom and policy requirement because he also has a claim pursuant to 28 U.S.C. §2201 (RA 9, ¶4), the Declaratory Judgment Act, such argument against the Chief is futile.

The plaintiff's claim pursuant to the Declaratory Judgment Act is barred by the more specific cause of action provided in Section 1983.  <u>See</u> <u>Zwetchkenbaum</u> v. <u>Operations, Inc.</u>, 165 F. Supp. 449, 454 (D.R.I. 1958) (the character and

availability of a coordinate remedy or remedies are factors to be weighed in considering whether declaratory relief should be given); <u>Cunningham Bros., Inc</u>. v. <u>Bail</u>, 407 F.2d 1165, 1169 (7th Cir. 1969) ("when the traditional remedy provides the parties with the procedural safeguards required by the law to insure the availability of a proper remedy,  the courts, in exercising their discretion, may properly dismiss the declaratory judgment action").

Here, it is axiomatic that Morin cannot circumvent the specific requirement for sustaining a Section 1983 action discussed above by pleading under the more general Declaratory Judgment Act.  Allowing Morin to proceed in such a manner would frustrate the very purpose of the custom and policy requirement, which the Supreme Court has acknowledged as being critical in this context.  <u>See</u> <u>Humphries</u> <u>supra</u>.  Therefore, any such attempt is unavailing and the District Court's decision should be affirmed on this additional basis.

## <u>CONCLUSION</u>

WHEREFORE, defendant/appellee Mark K. Leahy, Chief of Police of the

Town of Northborough, respectfully requests that this Court affirm the District

Court's summary judgment decision.

DEFENDANT/APPELLEE

MARK K. LEAHY, CHIEF OF THE
NORTHBOROUGH POLICE
DEPARTMENT,

By his attorneys,

/s/ Janelle M. Austin
Brian W. Riley (C.A. No. 14919)
Janelle M. Austin (C.A. No. 1141809)
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jaustin@k-plaw.com

573972/NBOR/0147

22

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7) (B) because this brief contains 5,007 words, excluding the parts of the brief exempted by Fed.R.App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared with a proportionally spaced typeface of 14 points.

/s/ Janelle M. Austin

## CERTIFICATE OF SERVICE

I, Janelle M. Austin, hereby certify that on January 27, 2017, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

J. Steven Foley, Esq.                    Bill Porter
Law Offices of J. Steven Foley          Julia E. Kobick
100 Pleasant Street, #100               Assistant Attorneys General
Worcester, MA 01609                      Government Bureau
                                         Office of the Attorney General
                                         One Ashburton Place
                                         Boston, MA 02108


/s/ Janelle M. Austin

# <u>ADDENDUM</u>

# TABLE OF CONTENTS

Memorandum and Order on Plaintiff's Motion for Summary Judgment (Docket No. 21), The Commonwealth's Cross-Motion for Summary Judgment (Docket No. 24), and Mark Leahy's Cross-Motion for Summary Judgment (Docket No. 29) ..................................................................1

Judgment ..........................................................................................16

General Laws c. 140, §131.................................................................17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALFRED MORIN, | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| | ) | **NO. 4:15-CV-40048-TSH** |
| v. | ) | |
| | ) | |
| MARK K. LEAHY, in his official capacity as Northborough Chief of Police, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS, | ) | |
| | ) | |
| Intervenor Defendant. | ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 21), THE COMMONWEALTH'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 24), AND MARK LEAHY'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 29)

**May 18, 2016**

**HILLMAN, D.J.**

Alfred Morin (Plaintiff) brings a Second Amendment challenge to a Massachusetts statute that prevents the issuance of a Class A license to carry firearms to individuals who have been convicted in another state of certain firearms-related offenses. The Commonwealth has intervened as a Defendant, and all parties move for summary judgment. For the reasons set forth below, I find that the statute is constitutional. Plaintiff's motion for summary judgment (Docket No. 21) is **_denied_**. The Commonwealth's cross-motion for summary judgment (Docket No. 24) is **_granted_**. Leahy's cross-motion for summary judgment (Docket No. 29) is **_granted_**.

## Background

The following facts are undisputed.  Alfred Morin (Plaintiff) was issued a Class A license to carry firearms in 1985 by the Commonwealth of Massachusetts.  He held the license until it expired in 2008.  Morin's habit was to carry a loaded pistol on his person at all times, in a holster strapped to his ankle.  In October of 2004, he drove from Massachusetts to Washington, DC to visit his daughter, and he carried his loaded pistol with him.  He was not aware that his Massachusetts license was not recognized in the District of Columbia.  While entering a Smithsonian Museum, he noticed a sign banning firearms.  He approached a guard and asked if he could check his weapon.  The guard contacted the police, who arrested him and charged him with carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition.  Morin pled guilty to attempting to carry a pistol without a license, in violation of D.C. Code § 22-3204(a)(1), and possession of an unregistered firearm, in violation of D.C. Code § 6-2376.  He was sentenced to sixty days in prison on each count, to run concurrently, as well as three months of supervised probation and twenty hours of community service.  The prison sentence was suspended.

In February of 2008, Morin applied to renew his Class A license in Massachusetts.  The renewal application form required him to indicate whether he had, "in any state or federal jurisdiction," been convicted of a "violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons for which a term of imprisonment may be imposed." (Docket No. 28-2 at 3.)   Morin answered "no."   The Northborough Police Department ran a fingerprint check, discovered his convictions, and denied his license in accordance with Mass. Gen. Laws ch. 140, § 131(d)(ii)(D).

2

Seven years later, in February of 2015, Morin submitted another application for a Class A

license. This time, when asked the same question about previous firearms-related convictions, he

answered "yes." Because of these convictions, the Chief of Police, Mark Leahy, once again denied

his application. The applicable statute prohibits the issuance of a Class A license to a "prohibited

person," which includes a person who "has, in any other state or federal jurisdiction, been

convicted . . . for the commission of . . . a violation of any law regulating the use, possession,

ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or

ammunition for which a term of imprisonment may be imposed." Mass. Gen. Laws ch. 140,

§ 131(d)(ii)(D).

On March 25, 2015, Morin brought this suit against Leahy in his official capacity as the

Northborough Chief of Police, challenging the constitutionality of Mass. Gen. Laws ch. 140, §§

129B(1)(i)(D), 129B(1)(ii)(D), and 131(d)(ii)(D).[1] In August of 2015, the Commonwealth was

allowed to intervene as a Defendant. The parties have filed cross-motions for summary judgment.

### Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary

judgment if the moving party shows, based on the materials in the record, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary

judgment must be denied if the evidence presented would allow a reasonable jury to return a verdict

for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering

a motion for summary judgment, the court construes the record in the light most favorable to the

---

[1] Morin also challenged the validity of section 131(d)(i)(D), which is the equivalent of section
131(d)(ii)(D) except that it applies to firearms-related convictions within the Commonwealth.
Morin concedes that he lacks standing to challenge section 131(d)(i)(D) because he was not
convicted in the Commonwealth.

nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 153 (1st Cir. 2009). If presented with cross-motions for summary judgment, the court "must consider each motion separately," applying the same standard to each motion. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

**Discussion**

*A. Massachusetts's Firearm Licensing Scheme*

Under Massachusetts law, there are two categories of licenses to carry firearms: Class A licenses and Class B licenses. *See* Mass. Gen. Laws ch. 140, § 131(a), (b). Both licenses must be obtained through the "licensing authority," which is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." *Id.* § 121.

Class B licenses entitle their holders to "purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms . . . and (ii) rifles and shotguns, including large capacity rifles and shotguns . . . ." *Id.* § 131(b). A "Firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." *Id.* § 121. "Large capacity" firearms include any semi-automatic firearms "capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device." *Id.* A "[l]arge capacity feeding device" includes any magazine or similar item that can hold "more than ten rounds." *Id.* Class B licenses "shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place"; "shall not entitle the holder thereof to possess a large capacity firearm"; and are to be issued "subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper." *Id.* § 131(b).

4

Class A licenses provide the same privileges as Class B licenses, except that the holder may possess "large capacity firearms" and may carry concealed firearms in public. *Id.* § 131(a). Class A licenses are issued "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." *Id.* Certain categories of applicants are ineligible for Class A licenses, including persons who have, "in any other state or federal jurisdiction, been convicted . . . for the commission of . . . a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed . . . ." *Id.* § 131(d)(ii)(D). It was under this section that Morin was denied his Class A license in 2015, and which forms the basis of this lawsuit.

In addition to the two classes of licenses, a licensing authority may separately issue a firearm identification (FID) card, which is more limited than either a Class A or Class B license. An FID card permits its holder to "own, transfer, or possess a firearm in his residence or place of business." *Commonwealth v. Gouse,* 965 N.E.2d 774, 785 n.14 (Mass. 2012). A person may apply to the licensing authority for an FID card, and various statutory requirements and exemptions govern the issuance of these cards. Mass. Gen. Laws ch. 140, § 129B(1); *see id.* § 129C.

In addition to challenging section 131(d)(ii)(D), under which Morin was denied his Class A license, Morin also challenges sections 129B(1)(i)(D) and 129B(1)(ii)(D), which govern the issuance of FID cards. However, he has not alleged that he ever applied for or was denied an FID card. Accordingly, because he has not been injured by the application of sections 129B(1)(i)(D) and 129B(1)(ii)(D), he lacks standing to challenge their constitutionality. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Hightower v. City of Boston*, 693 F.3d 61, 70-71

(1st Cir. 2012) (appellant whose Class A license was denied lacked standing to challenge the potential issuance of Class B license and/or FID card).

B. *The Second Amendment and D.C. v. Heller*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In the landmark decision of *D.C. v. Heller*, the Supreme Court held that the Second Amendment provides an individual right to bear arms. 554 U.S. 570, 576-626 (2008). The Court based its holding on its construction of the Second Amendment's "operative clause"—"the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 577, 592. The Court interpreted this clause to "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court held that, although "self-defense had little to do with the right's *codification;* it was the *central component* of the right itself." *Id.* at 599. The Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Importantly, the Court also held that "the right secured by the Second Amendment is not unlimited" and cautioned that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. The Court further clarified that it presented "these presumptively lawful regulatory measures only as examples" rather than as an exhaustive list. *Id.* at 627 n.26.

Two years after *Heller*, the Supreme Court held that the Second Amendment applies to state and local regulation of firearms. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). "Together, *Heller* and *McDonald* establish that states may not impose legislation that works a complete ban on the possession of operable handguns in the home by law-abiding, responsible citizens for use in immediate self-defense." *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015). However, the Supreme Court "did not say, and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment." *Id.* at 348.

C. *Standard of Review for Second Amendment Challenges*

Although *Heller* established that the Second Amendment guarantees an individual's right to bear arms for the purpose of self-defense, and *McDonald* made this right applicable to the states, the Supreme Court has yet to set forth a framework for analyzing constitutional challenges pursuant to the Second Amendment. *See United States v. Booker*, 644 F.3d 12, 22 (1st Cir. 2011) (citing *Heller*, 554 U.S. at 626, 634-35). In *Heller*, the plaintiff had challenged the constitutionality of a law that completely banned handgun possession in the home and also required that any lawful firearm in the home be rendered inoperable at all times. 554 U.S. at 628. The Court held that, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the District's ban on handgun possession in the home "would fail constitutional muster." *Id.* at 628-29.

Two years after *Heller*, the Third Circuit propounded a two-step approach for Second Amendment challenges:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law

7

passes muster under that standard, it is constitutional. If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted). Regarding the second part of the test, the Third Circuit held that the right to bear arms, like the right to free speech, should be "susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of [arms-related conduct] at issue." *Id.* at 96-97.

Seven other circuits have since explicitly adopted the Third Circuit's approach.[2] The First Circuit has not; however, in conducting post-*Heller* Second Amendment challenges, the court's analyses have not been inconsistent with the two-part framework.

D. *First Circuit Post-Heller Second Amendment Decisions*

Since *Heller*, the First Circuit has addressed Second Amendment challenges to: 18 U.S.C. § 922(x)(2)(A), which bans juvenile possession of handguns; 18 U.S.C. § 922(g)(1), which prohibits possession of firearms by persons convicted of felonies; 18 U.S.C. § 922(g)(9), which prohibits firearm possession by individuals convicted of misdemeanor crimes of domestic violence; and Mass. Gen. Laws ch. 140, § 131(f), which allows the licensing authority to revoke Class A licenses on the occurrence of a disqualifying event. *See United States v. Armstrong*, 706 F.3d 1, 8 (1st Cir. 2013) (section 922(g)(9)); *Hightower*, 693 F.3d at 76-78 (section 131(f)); *Booker*, 644 F.3d at 26 (section 922(g)(9)); *United States v. Torres-Rosario*, 658 F.3d 110, 113

---

[2] *See United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518, 520 (6th Cir. 2012); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1248, 1260 n.34 (11th Cir. 2012); *Heller v. D.C.*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010). The Seventh Circuit has not explicitly adopted the approach but has reached virtually the same conclusion. *See Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).

8

(1st Cir. 2011) (section 922(g)(1)); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (section 922(x)(2)(A)). The court has upheld each one of these challenged laws.

Each of these cases, with the exception of *Hightower*, involved laws that completely ban the possession of firearms by certain classes of individuals. In the instant case, however, like in *Hightower*, Morin challenges only his inability to receive a Class A license—which is the most comprehensive license available in Massachusetts and allows its holder to carry loaded, high-capacity, concealed firearms in public. This distinction is significant, because although the First Circuit has not yet established a standard for reviewing Second Amendment challenges, it is apparent from the above-cited precedents that the standard differs depending on the conduct that is burdened by the law in question. The more significantly the law burdens a person's Second Amendment rights, the more stringent the review. In the case at hand, I find that the First Circuit's decision in *Hightower* is directly applicable, and the Second Amendment issue must be resolved in favor of the Commonwealth.

### E. *Morin's As-Applied Challenge*

Morin urges this Court to apply the two-step analytical framework that has been adopted by many of our sister Circuits, and to determine that the law burdens conduct within the scope of the Second Amendment and fails a means-ends scrutiny test. He argues that section 131(d)(ii)(D) "implicates the core Second Amendment right to possess a handgun in [his] home for defense of hearth and home." (Docket No. 22 at 8.) And, he asserts that the law fails under scrutiny because the Commonwealth has not met its burden of "establishing at least a strong public interest in its lifetime handgun ban on the Plaintiff" as well as "a close fit between the legislation and its broad application to its citizens to justify such a substantial encumbrance on individual rights." (Docket No. 22 at 11.)

9

The Commonwealth, for its part, also advocates for the two-step approach. Under this framework, the Commonwealth first argues that section 131(d)(ii)(D) does not implicate the Second Amendment, because the Second Amendment extends only to law-abiding, responsible persons. *See Heller*, 554 U.S. at 635. Morin is categorically not a law-abiding responsible person, according to the Commonwealth, because he has been convicted of weapons-related offenses.

Next, the Commonwealth argues that even if section 131(d)(ii)(D) does implicate the Second Amendment, it withstands constitutional scrutiny. Under the second prong of the two-part test, the Commonwealth asserts that section 131(d)(ii)(D) would be subject to, at most, intermediate scrutiny, because the law does not infringe on the "core" right of the Second Amendment; it regulates the carrying of concealed weapons in public rather than possession of weapons in the home. The Commonwealth further argues that section 131(d)(ii)(D) would pass muster because it is substantially related to the indisputably important governmental objective of promoting public safety and preventing crime. And, the law is narrowly tailored, because it disqualifies only those persons who are convicted of weapons- or ammunition-related offenses for which a term of imprisonment may be imposed.

The parties' arguments are well reasoned, thorough, and far more extensive than the summaries I have set forth above. However, I find that there is a more direct route to the resolution of this case—a trail forged by the First Circuit in *Hightower*, which I follow obligingly. In *Hightower*, the appellant, Stacey Hightower, had her Class A license revoked after the licensing authority learned that she had untruthfully answered a question on her license application form. 693 F.3d at 68. She challenged the law that allowed the licensing authority to revoke her license, which provides that a Class A license "may be revoked or suspended by the licensing authority if

it appears that the holder is no longer a suitable person to possess such license." Mass. Gen. Laws ch. 140, § 131(f).

The court distinguished the interest that Hightower was advancing—obtaining a license that allowed her to carry concealed weapons outside the home—from the "core interest emphasized in *Heller*," which is "the possession of operative firearms for use in defense of the home." *Hightower*, 693 F.3d at 72. The court held that, pursuant to *Heller*, "the government may regulate the carrying of concealed weapons outside of the home." *Id.* at 73. The court concluded that "the revocation of a firearms license on the basis of providing false information . . . is not a violation of the Second Amendment in this case." *Id.* at 74.

Here, like in *Hightower*, Morin challenges his ability to obtain a Class A license. Although he frames the right at issue as his right to possess a firearm in the home, this argument is undermined by the fact that he seeks the least restrictive license available in Massachusetts, allowing him to carry concealed firearms in public. Furthermore, as stated in his affidavit, it was his habit for the entire time that he maintained his Class A license—approximately twenty years— to carry a concealed pistol on his person at all times. Thus, it is not necessary to determine whether a complete categorical prohibition on the arms rights of individuals who have been convicted of certain weapons-related misdemeanors is constitutional, because that is not what is being challenged in this case.

It is also unnecessary to speculate on the level of scrutiny that the First Circuit might apply to restrictions on the possession of firearms outside the home. In *Hightower*, the court held that section 131(f) would pass muster under *any* level of scrutiny, because "the interest . . . in carrying concealed weapons outside the home is distinct from th[e] core interest emphasized in *Heller*." *Hightower*, 693 F.3d at 72, 74; *see also Powell*, 783 F.3d at 348 (the Supreme Court has not said

11

that "*publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment."). Noting the highly unsettled nature of the law in this arena, the court explicitly declined to adopt a particular level of scrutiny for assessing laws that restrict a person's ability to carry concealed weapons in public. *See Hightower*, 693 F.3d at 74. The court found it sufficient to conclude that the requirement at issue in *Hightower*—that firearms license applicants must provide truthful information—"serve[d] a variety of important purposes." *Id.* at 74.

Like section 131(f), section 131(d)(ii)(D)—the part of the Class A licensing scheme at issue in this case—also serves an important purpose; namely, preventing potentially dangerous persons from carrying concealed weapons in public. As the Supreme Judicial Court has explained, the global purpose of section 131 is to "limit access to deadly weapons by irresponsible persons." *Chief of Police of City of Worcester v. Holden*, 26 N.E.3d 715, 723 (Mass. 2015) (citation omitted). In this regard, the Commonwealth brings my attention to empirical evidence demonstrating that persons who are convicted of weapons-related misdemeanors are significantly more likely to commit crimes in the future than are persons without such convictions. Specifically, researchers in one study found that handgun purchasers with one prior misdemeanor conviction for non-violent conduct that involved firearms were 6.4 times more likely than persons without prior convictions to commit future criminal offenses. Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. AM. MED. ASS'N 2083, 2086 (1998). This same class of persons was 7.7 times more likely to commit a subsequent non-violent firearms offense and 4.4 times more likely to commit a violent offense. *Id.*

12

In another study, researchers found that persons with a prior misdemeanor conviction were five times more likely than persons without a conviction to commit future crimes that would disqualify them from firearms possession under state and federal law. Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. TRAUMA 948, Table 2 (2010). Another study of nonviolent offenders released from prison showed that approximately one in five offenders were rearrested for a violent offense within three years of release. Bureau of Justice Statistics, U.S. Department of Justice, *Profile of Nonviolent Offenders Exiting State Prisons*, at 2, 4 (Oct. 2004). Another report issued by the Department of Justice showed that 79.5% of prisoners convicted of weapons-related offenses were rearrested within five years of release. Bureau of Justice Statistics, U.S. Department of Justice, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 8 (Apr. 2014).

Morin seeks to counter this empirical evidence by urging the court to consider the particular facts of his situation. He presents himself as an elderly, law-abiding citizen, who has led an exemplary life and who only accidentally committed the predicate offenses in this case. The First Circuit has not explicitly decided whether an individual's personal circumstances are relevant in an as-applied Second Amendment challenge. However, the court has noted that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Torres-Rosario*, 658 F.3d at 113. The court has also held that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23 (citation omitted). And, tellingly, in addressing as-applied Second Amendment challenges since *Heller*, the First Circuit

13

has not made individualized considerations. *See Hightower*, 693 F.3d at 76; *Armstrong*, 706 F.3d at 8; *Rene E.*, 583 F.3d at 12.

Accordingly, I decline to consider Morin's personal circumstances in deciding whether section 131(d)(ii)(D) is unconstitutional as applied to him. It would be unreasonable to expect the courts to make individualized considerations for every person who is statutorily precluded from obtaining a firearms license but who nevertheless believes that he or she should be entitled to carry a weapon. What is relevant in this as-applied challenge is the class of persons affected, not the particular circumstances of each individual's situation.

Thus, pursuant to the First Circuit's decision in *Hightower*, I find that the right to obtain a Class A license to carry a concealed firearm in public is not a "core" Second Amendment right, and that section 131(d)(ii)(D) serves the important purpose of preventing potentially dangerous individuals from carrying concealed firearms. Accordingly, the law is constitutional as applied to Morin.

### F. *Morin's Facial Challenge*

"[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Morin's facial challenge cannot be maintained, because his own situation presents a set of circumstances in which the application of section 131(d)(ii)(D) is constitutional.

### G. *Leahy's Additional Arguments*

Leahy joins the Commonwealth's arguments but has also filed a separate memorandum, in which he challenges whether he is a proper defendant in this suit. Leahy is named as a defendant

in his official capacity as the Chief of Police. He argues that the claims against him should be treated as claims against the Town, and that such claims fail as a matter of law because Morin has not established that his injury was caused by a municipal policy or custom, so as to state a viable *Monell* claim. Leahy's argument is misplaced, because Morin does not seek damages. He seeks declaratory and prospective injunctive relief only, to enjoin an alleged ongoing constitutional violation. This type of suit may be brought against an official who is charged with implementing the purportedly unconstitutional law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). Leahy is a proper defendant in this case.

### Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment (Docket No. 21) is ***denied***, the Commonwealth's cross-motion for summary judgment (Docket No. 24) is ***granted***, and Leahy's cross-motion for summary judgment (Docket No. 29) is ***granted***. Judgment shall enter in favor of Leahy and the Commonwealth.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Morin,

                        Plaintiff,

                                                CIVIL ACTION
            V.
                                                NO. 15-40048-TSH
Leahy, et al.,

                        Defendants,


## JUDGMENT


HILLMAN,  D. J.


    In accordance with the Court's Memorandum and Order dated 5/18/16,

granting defendants' motions for summary judgment in the above-entitled action, it

is hereby ORDERED:

                    Judgment for the ___Defendants___




                                            By the Court,


___5/18/16___                               _/s/ Martin Castles_
   Date                                     Deputy Clerk




ADD.  16

<u>*ALM GL ch. 140, § 131*</u>

Current through Act 399 of the 2016 Legislative Session, with the exception of Act 333 and 351.

*Annotated Laws of Massachusetts > PART I ADMINISTRATION OF THE GOVERNMENT > Chapter 140 Licenses*

## Notice

⚐ This section has more than one version with varying effective dates.

*Second of two versions of this section.*

## § 131. ˙Firearms — Possession — License to Carry.  [Effective January 1, 2021]

The issuance and possession of a license to carry firearms shall be subject to the following conditions and restrictions:

(a)   A license shall entitle a holder thereof of a license to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority considers proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it considers proper. A violation of a restriction imposed by the licensing authority under this paragraph shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that *section 10 of chapter 269* shall not apply to a violation of this paragraph.

(b)   The colonel of state police may, after an investigation, grant a license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of the club; provided, however, that not less than 1 shareholder of the club shall be qualified and suitable to be issued a license; and provided further, that such large capacity weapons and ammunition feeding devices may be used under the club license only by a member that possesses a valid firearm identification card issued pursuant to section 129B or a valid license to carry firearms, or by such other person that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid license to carry firearms. The club shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

No large capacity weapon or large capacity feeding device shall be removed from the premises except to: (i) transfer the firearm or feeding device to a licensed dealer; (ii) transport the firearm or feeding

---

˙ There are two sections 131.

familiar with the applicant's mental illness, alcohol or substance abuse and that in the physician's or psychologist's opinion, the applicant is not disabled by a mental illness, alcohol or substance abuse in a manner that shall prevent the applicant from possessing a firearm, rifle or shotgun; (B) committed by a court order to a hospital or institution for mental illness, unless the applicant was granted a petition for relief of the court order pursuant to said *section 36C of said chapter 123* and submits a copy of the court order with the application; (C) subject to an order of the probate court appointing a guardian or conservator for a incapacitated person on the grounds that the applicant lacks the mental capacity to contract or manage the applicant's affairs, unless the applicant was granted a petition for relief of the order of the probate court pursuant to *section 56C of chapter 215* and submits a copy of the order of the probate court with the application; or (D) found to be a person with an alcohol use disorder or substance use disorder or both and committed pursuant to said *section 35 of said chapter 123*, unless the applicant was granted a petition for relief of the court order pursuant to said section 35 and submits a copy of the court order with the application;

**(iv)** is younger than 21 years of age at the time of the application;

**(v)** is an alien who does not maintain lawful permanent residency;

**(vi)** is currently subject to: (A) an order for suspension or surrender issued pursuant to sections 3B or *3C of chapter 209A* or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to said chapter 209A or a similar order issued by another jurisdiction, including any order described in *18 U. S. C. 922(g)(8)*;

**(vii)** is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction;

**(viii)** has been discharged from the armed forces of the United States under dishonorable conditions;

**(ix)** is a fugitive from justice; or

**(x)** having been a citizen of the United States, has renounced that citizenship.

The licensing authority may deny the application or renewal of a license to carry, or suspend or revoke a license issued under this section if, in a reasonable exercise of discretion, the licensing authority determines that the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry. A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety. Upon denial of an application or renewal of a license based on a determination of unsuitability, the licensing authority shall notify the applicant in writing setting forth the specific reasons for the determination in accordance with paragraph (e). Upon revoking or suspending a license based on a determination of unsuitability, the licensing authority shall notify the holder of a license in writing setting forth the specific reasons for the determination in accordance with paragraph (f). The determination of unsuitability shall be subject to judicial review under said paragraph (f).

**(e)** Within seven days of the receipt of a completed application for a license to carry or possess firearms, or renewal of same, the licensing authority shall forward one copy of the application and one copy of the applicant's fingerprints to the colonel of state police, who shall within 30 days advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified for any of the foregoing reasons from possessing a license to carry or possess firearms. In searching for any disqualifying history of the applicant, the colonel shall utilize, or cause to be utilized, files maintained by the department of probation and statewide and nationwide criminal justice, warrant and protection order information systems and files including, but not limited to, the National Instant Criminal Background Check System. The colonel shall inquire of the commissioner of the department of mental

health relative to whether the applicant is disqualified from being so licensed. If the information available to the colonel does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law, he shall certify such fact, in writing, to the licensing authority within said 30 day period.

The licensing authority may also make inquiries concerning the applicant to: (i) the commissioner of the department of criminal justice information services relative to any disqualifying condition and records of purchases, sales, rentals, leases and transfers of weapons or ammunition concerning the applicant; (ii) the commissioner of probation relative to any record contained within the department of probation or the statewide domestic violence record keeping system concerning the applicant; and (iii) the commissioner of the department of mental health relative to whether the applicant is a suitable person to possess firearms or is not a suitable person to possess firearms. The director or commissioner to whom the licensing authority makes such inquiry shall provide prompt and full cooperation for that purpose in any investigation of the applicant.

The licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no such license shall be issued unless the colonel has certified, in writing, that the information available to him does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law.

The licensing authority shall provide to the applicant a receipt indicating that it received the application. The receipt shall be provided to the applicant within 7 days by mail if the application was received by mail or immediately if the application was made in person; provided, however, that the receipt shall include the applicant's name and address; current license number and license expiration date, if any; the date the licensing authority received the application; the name, address and telephone number of the licensing authority; the agent of the licensing authority that received the application; the type of application; and whether the application is for a new license or a renewal of an existing license. The licensing authority shall keep a copy of the receipt for not less than 1 year and shall furnish a copy to the applicant if requested by the applicant.

(f) A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor. Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post–judgment motion shall operate to stay such revocation or suspension. Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system. A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any.

Any applicant or holder aggrieved by a denial, revocation, suspension or restriction placed on a license, unless a hearing has previously been held pursuant to chapter 209A, may, within either 90 days after receiving notice of the denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority shall respond to the applicant or, in the case of a restriction, any time after a restriction is placed on the license pursuant to this section, file a petition to obtain judicial review in the district court having jurisdiction in the city or town in which the applicant filed the application or in which the license was issued. If after a hearing a justice of the court finds that there was no reasonable ground for denying, suspending, revoking or restricting the license and that the petitioner is not prohibited by law from possessing a license, the justice may order a license to be issued or reinstated to the petitioner or may order the licensing authority to remove certain restrictions placed on the license.

ALM GL ch. 140, § 131

(g) A license shall be in a standard form provided by the commissioner of criminal justice information services in a size and shape equivalent to that of a license to operate motor vehicles issued by the registry of motor vehicles pursuant to *section 8 of chapter 90* and shall contain a license number which shall clearly indicate the name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the licensee. The license shall be clearly marked "License to Carry Firearms". The license shall provide in a legible font size and style the phone numbers for the National Suicide Prevention Lifeline and the Samaritans Statewide Helpline. The application for such license shall be made in a standard form provided by the executive director of the criminal history systems board, which form shall require the applicant to affirmatively state under the pains and penalties of perjury that such applicant is not disqualified on any of the grounds enumerated above from being issued such license.

(h) Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a house of correction, or by both such fine and imprisonment.

(i) A license to carry or possess firearms shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue and shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue; provided, however, that, if the licensee applied for renewal before the license expired, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is approved or denied. If a licensee is on active duty with the armed forces of the United States on the expiration date of the license, the license shall remain valid until the licensee is released from active duty and for a period not less than 180 days following the release; provided, however, that, if the licensee applied for renewal prior to the end of that period, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is approved or denied. An application for renewal of a Class B license filed before the license has expired shall not extend the license beyond the stated expiration date; provided, that the Class B license shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue.If a licensee is on active duty with the armed forces of the United States on the expiration date of the license, the license shall remain valid until the licensee is released from active duty and for a period not less than 180 days following the release; provided, however, that, if the licensee applied for renewal prior to the end of that period, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is approved or denied. The fee for the application shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general fund of the commonwealth and not less than $50,000 of the funds deposited into the General Fund shall be allocated to the Firearm Licensing Review Board, established in section 130B, for its operations and that any funds not expended by said board for its operations shall revert back to the General Fund; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. For active and retired law enforcement officials, or local, state, or federal government entities acting on their behalf, the fee for the application shall be set at $25, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $12.50 of the fee, and $12.50 of the fee shall be deposited into the general fund of the commonwealth. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit such portion of the license application fee into the Firearms Record Keeping Fund quarterly, not later than January 1, April 1, July 1 and October 1 of each year. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit quarterly such portion of the license application fee as is to be deposited into the General Fund, not later than January 1, April 1, July 1 and October 1 of each year. For the purposes of *section 10 of chapter 269*, an expired license to carry firearms shall be deemed to be valid for a period not to exceed 90 days beyond the stated date of expiration, unless such license to carry firearms has been revoked.

Janelle Austin

ADD. 21

Any person over the age of 70 and any law enforcement officer applying for a license to carry firearms through his employing agency shall be exempt from the requirement of paying a renewal fee for a Class A or Class B license to carry.

(j)

   (1) No license shall be required for the carrying or possession of a firearm known as a detonator and commonly used on vehicles as a signaling and marking device, when carried or possessed for such signaling or marking purposes.

   (2) No license to carry shall be required for the possession of an unloaded large capacity rifle or shotgun or an unloaded feeding device therefor by a veteran's organization chartered by the Congress of the United States, chartered by the commonwealth or recognized as a nonprofit tax-exempt organization by the Internal Revenue Service, or by the members of any such organization when on official parade duty or during ceremonial occasions. For purposes of this subparagraph, an "unloaded large capacity rifle or shotgun" and an "unloaded feeding device therefor" shall include any large capacity rifle, shotgun or feeding device therefor loaded with a blank cartridge or blank cartridges, so–called, which contain no projectile within such blank or blanks or within the bore or chamber of such large capacity rifle or shotgun.

(k) Whoever knowingly issues a license in violation of this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a jail or house of correction, or by both such fine and imprisonment.

(l) The executive director of the criminal history systems board shall send electronically or by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a form for the renewal of such license. The form for renewal shall include an affidavit in which the applicant shall verify that the applicant has not lost any firearms or had any firearms stolen from the applicant since the date of the applicant's last renewal or issuance.The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license. The commissioner of criminal justice information services shall provide electronic notice of expiration only upon the request of a cardholder. A request for electronic notice of expiration shall be forwarded to the department on a form furnished by the commissioner. Any electronic address maintained by the department for the purpose of providing electronic notice of expiration shall be considered a firearms record and shall not be disclosed except as provided in _section 10 of chapter 66_.

(m) Notwithstanding the provisions of _section 10 of chapter 269_, any person in possession of a firearm, rifle or shotgun whose license issued under this section is invalid for the sole reason that it has expired, not including licenses that remain valid under paragraph (i) because the licensee applied for renewal before the license expired, but who shall not be disqualified from renewal upon application therefor pursuant to this section, shall be subject to a civil fine of not less than $100 nor more than $5,000 and the provisions of _section 10 of chapter 269_ shall not apply; provided, however, that the exemption from the provisions of said _section 10 of said chapter 269_ provided herein shall not apply if: (i) such license has been revoked or suspended, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; (ii) revocation or suspension of such license is pending, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; or (iii) an application for renewal of such license has been denied. Any law enforcement officer who discovers a person to be in possession of a firearm, rifle or shotgun after such person's license has expired, meaning after 90 days beyond the stated expiration date on the license, has been revoked or suspended, solely for failure to give notice of a change of address, shall confiscate such firearm, rifle or shotgun and the expired or suspended license then in

possession and such officer, shall forward such license to the licensing authority by whom it was issued as soon as practicable. The officer shall, at the time of confiscation, provide to the person whose firearm, rifle or shotgun has been confiscated, a written inventory and receipt for all firearms, rifles or shotguns confiscated and the officer and his employer shall exercise due care in the handling, holding and storage of these items. Any confiscated weapon shall be returned to the owner upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation or may be otherwise disposed of in accordance with the provisions of section 129D. The provisions of this paragraph shall not apply if such person has a valid license to carry firearms issued under section 131F.

(n) Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the executive director of the criminal history systems board, who shall inform the licensing authority forthwith of the existence of any disqualifying condition discovered or occurring subsequent to the issuance of a license under this section.

(o) No person shall be issued a license to carry or possess a machine gun in the commonwealth, except that a licensing authority or the colonel of state police may issue a machine gun license to:

(i) a firearm instructor certified by the municipal police training committee for the sole purpose of firearm instruction to police personnel;

(ii) a bona fide collector of firearms upon application or upon application for renewal of such license.

(p) The executive director of the criminal history systems board shall promulgate regulations in accordance with chapter 30A to establish criteria for persons who shall be classified as bona fide collectors of firearms.

(q) Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.

(r) The secretary of the executive office of public safety or his designee may promulgate regulations to carry out the purposes of this section.

## History

1906, 172, § 1; 1911, 548, § 1; 1919, 207, § 1; 1922, 485, § 9; 1925, 284, § 4; 1927, 326, § 3; 1936, 302; 1951, 201; 1953, 319, § 20; 1953, 454; 1957, 688, § 15; 1959, 296, § 6; 1960, 293; 1969, 799, § 11; 1972, 415; 1973, 138; 1973, 892, § 7; 1974, 312; 1974, 649, § 1; 1975, 4, § 1; 1975, 113, § 1; 1984, 420, § 2; 1986, 481, § 2; 1987, 465, § 33; *1994, 24, § 3*; *1996, 151, §§ 325*–329; *1996, 200, § 28*; *1998, 180, § 41*; *1998, 358, §§ 6*–9; *2002, 196, § 22*; *2002, 513, § 2*; *2003, 26, § 429*; *2003, 46, § 103*; *2004, 150, §§ 10*–16; *2008, 224*; *2010, 256, § 97*; *2010, 466, § 3*; *2011, 9, §§ 16, 17*; *2014, 284, §§ 46, 47, 49, 52, 54, 55*.

Annotations

## Notes

**Editorial Note—**

**Codification—**

**Acts 1906, 172, § 1**enacted this section.

**Acts 1975, 4, § 1**effective December 31, 1974, provides:

SECTION 1. The operation of chapter six hundred and forty–nine of the acts of nineteen hundred and seventy–four shall be suspended until April first, nineteen hundred and seventy–five.