# Law Office of
# J. Steven Foley

---

March 1, 2017

Margaret Carter, Clerk of Court
Office of the Clerk
United States Court of Appeals
for the First Circuit
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 2500
Boston MA 02210

> **Re:**  *Morin v. Leahy,* **Case No. 16-1904**
> **Appellant's Citation of Supplemental Authority Pursuant to Rule 28(j)**

Dear Ms. Carter:

Pursuant to Federal Rule of Appellate Procedure 28(j), this letter provides an additional citation of supplemental authority relevant to the issues presented for consideration by the court in the above-referenced matter.

Appellant submits the following citation, which supports his argument found at page 14 of the Appellant's brief, that the Class B LTC was eliminated before Dr. Morin submitted his application: Batty v. Albertelli, 15-cv-10238-FDS (D. Mass. Feb 25, 2017).

Footnote 3 in *Batty* at *2 acknowledges that licensing authorities were directed to refrain from issuing Class B licenses upon enactment of amended licensing laws in 2014.

Footnote 11 in *Batty* at *10 also acknowledges that Class B licenses were no longer available due to a 2014 statutory amendment.

For the convenience of the Court and opposing counsel, a true and accurate copy of the Batty v. Albertelli decision is attached as Exhibit "A".

Respectfully submitted,

 /s/ J. Steven Foley
J. Steven Foley
Attorney for the Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on March, 2017, an electronic PDF of this Appellants' Citation of Supplemental Authority Pursuant to FRAP 28(j) was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ J. Steven Foley
J. Steven Foley
Attorney for the Plaintiff-Appellant

**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

JEAN BATTY, EDWARD RUSSO,                )
and COMMONWEALTH SECOND                  )
AMENDMENT,                               )
                                         )
            Plaintiffs,                  )
                                         )        Civil Action No.
            v.                           )        15-10238-FDS
                                         )
KEN ALBERTELLI, in his official capacity )
as Chief of the Winchester Police Department, )
                                         )
            Defendant.                   )
_____)

**MEMORANDUM AND ORDER ON MOTION FOR JUDGMENT
ON THE PLEADINGS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT**

SAYLOR, J.

  This is a federal constitutional challenge to the policy of the Town of Winchester

concerning firearm licenses.  Plaintiffs Jean Batty, Edward Russo, and Commonwealth Second

Amendment Inc. have brought suit under 42 U.S.C. § 1983, contending that a policy of the

Winchester Police Department that restricts the ability of first-time applicants to obtain licenses

to carry firearms violates the Second and Fourteenth Amendments.  In particular, plaintiffs

contend that defendant unconstitutionally restricts the firearm licenses of first-time applicants to

target and hunting purposes.  The named defendant is Ken Albertelli, the chief of the Winchester

Police Department.

  Defendant has moved for judgment on the pleadings, or, in the alternative, for summary

judgment.[1]  Plaintiffs have cross-moved for summary judgment.  For the following reasons, defendant's motion will be granted in part and denied in part, and plaintiffs' motion will be denied.

## I.    Background

The facts set forth below are undisputed.

### A.    Massachusetts Regulatory Framework

In Massachusetts, it is a crime to possess a firearm in public without a valid license to carry.  Mass. Gen. Laws ch. 269, § 10(a).[2]  Licenses to carry firearms may be requested by application pursuant to Mass. Gen. Laws ch. 140, § 131(d).  Applications are made to a "licensing authority," which is defined as either the applicant's local police chief or the board or officer having control of the police in a city or town.  *Id.* §§ 121, 131(d).  Massachusetts law specifies the circumstances under which a licensing authority may grant licenses, when licenses may be revoked, and what restrictions licenses may contain.  *Id.* § 131.

Under the statute, a licensing authority "may issue" a license if "it appears" that the applicant satisfies both parts of a two-step inquiry, demonstrating that he or she (1) is not a "prohibited person" and (2) has a "proper purpose" for carrying a firearm.  *Ruggiero v. Police Com'r of Boston*, 18 Mass. App. Ct. 256, 259 (1984) (discussing an earlier, similarly worded version of the statute); Mass. Gen. Laws ch. 140, § 131(d).[3]

---

[1]  Both parties cite extensively to the record in support of their motions.  Because these motions have essentially been argued as cross-motions for summary judgment, the Court will consider the full record in analyzing the constitutional claims.

[2]  With limited exceptions, a "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured."  Mass. Gen. Laws ch. 140 § 121.

[3]  Prior to 2014, a licensing authority could issue licenses in two forms:  Class A or Class B.  Mass. Gen. Laws. ch. 140, § 131(a–b).  A Class A license permitted an individual to carry a concealed firearm in public and to possess a large-capacity firearm, while a Class B license permitted only open carry of firearms that were not

At the first step of the inquiry, the licensing authority examines whether the applicant is a "prohibited person." Mass. Gen. Laws ch. 140, § 131(d). An applicant may be categorically prohibited from possessing a firearm (for example, minors). *Id.* Alternatively, an applicant may be found to be a prohibited person if the licensing authority, in the reasonable exercise of his or her discretion, determines that the applicant is not a "suitable person" based on evidence or factors that suggest the applicant would cause a risk to public safety. *Id.* The parties agree that plaintiffs here are not categorically prohibited from obtaining a license.

At the second step of the inquiry, the licensing authority is required to consider whether the applicant has a "proper purpose" for carrying a firearm. *Ruggiero*, 18 Mass. App. Ct. at 259. The statute does not provide an exhaustive list of purposes for which an applicant may properly request a license. Instead, it states that the licensing authority "may issue" a license if the applicant (1) "has good reason to fear injury to the applicant or the applicant's property" or (2) "for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section." Mass. Gen. Laws ch. 140, § 131(d).[4] In *Ruggiero*, the Massachusetts appellate court summarized an earlier version of the statute as follows: "Without excluding other valid reasons for being licensed, the statute identifies two purposes which will furnish adequate cause to issue a license—'good reason to fear injury to person or property' and an intent to carry a firearm for use in target practice." 18 Mass. App. Ct. at 259. When an applicant seeks a license solely for self-protection, the licensing

---

classified as large-capacity. *Id*. In 2014, the Massachusetts legislature amended the licensing laws, eliminating Class B licenses, effective in 2021. *See* Mass. Acts ch. 284, § 101. However, effective immediately, licensing authorities were directed to refrain from issuing Class B licenses and to issue new and renewed licenses as Class A licenses. *Id.*

[4] This is the language from the current version of the statute, which took effect on January 1, 2015. *See* Mass. Acts ch. 284, § 48. The earlier version, in effect on the date of plaintiffs' applications, used slightly different language but was materially the same.

authority may require that the applicant distinguish his or her own specific need for protection from the needs of members of the general public. *Id.* at 261 (finding that, under an earlier, similarly worded version of the statute, an applicant's stated purposes to avoid "spend[ing] his entire life behind locked doors [and to prevent becoming] a potential victim of crimes" did not require issuance of a license for self-defense in public).

Even when an applicant otherwise meets the requirements for license approval, the licensing authority may issue the license "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. Laws ch. 140, § 131(a–b). Pursuant to that provision, the licensing authority may restrict a license to those uses for which the authority determines there to be an appropriate reason. *See Ruggiero*, 18 Mass. App. Ct. at 260 (upholding issuance of license with target, hunting, and sporting restriction where applicant requested license for self-defense purposes).

A licensing authority's decision to deny or restrict a license is subject to judicial review. Mass. Gen. Laws ch. 140, § 131(f). An applicant who has been denied a license must challenge the denial within ninety days. *Id.* By comparison, an applicant who has been granted a license with restrictions may challenge the restrictions in court at "any time." *Id.* § 131(a). Upon judicial review, the licensing authority's determination to impose restrictions may be reversed only if the authority had "no reasonable ground for . . . restricting the license" or the determination is "arbitrary, capricious, or an abuse of discretion." *Id.* § 131(f); *Chief of Police of Shelburne v. Moyer,* 16 Mass. App. Ct. 543, 546 (1983)).

Unless revoked or suspended, a license "shall be valid" for between five and six years, and shall expire on the licensee's birthday. Mass. Gen. Laws ch. 140, § 131(i). The licensing authority "shall" revoke or suspend a license "upon the occurrence of any event that would have

4

disqualified the holder from being issued such license or from having such license renewed." *Id.*

§ 131(f).  Additionally, a license "may be" revoked or suspended if the licensee is "no longer a

suitable person." *Id.*  The determination to revoke or suspend a license is also subject to judicial

review. *Id.*

    **B.**  **<u>Winchester Firearm Licensing Policy</u>**

        Ken Albertelli is the chief of the Winchester Police Department.  (Pl. SMF ¶ 22).  As

police chief, he is the authority responsible for issuing firearm licenses to Winchester residents

and business owners pursuant to Mass. Gen. Laws ch. 140, § 131.  (*Id.*).  It is Albertelli's

practice to personally review each application he receives to determine whether to grant it, and

what restrictions, if any, the application warrants.  (*Id.* ¶ 23).

        Albertelli imposes three varieties of restrictions on firearm licenses:  (1) employment, (2)

target and hunting, and (3) sporting.  A written policy describing those restrictions was adopted

in February 2016.  It states:

> **<u>EMPLOYMENT</u>** – restricts possession to a business owner engaged in business
> activities or to an employee while engaged in work related activities, and
> maintaining proficiency, where the employer requires carry of a firearm (i.e.
> armored car, security guard, etc.).  Includes travel to and from the activity location.
>
> **<u>TARGET AND HUNTING</u>** – restricts possession to the purpose of lawful
> recreational shooting or competition; for use in the lawful pursuit of game animals
> and birds; for personal protection in the home; and for the purpose of collecting
> (other than machine guns).  Includes travel to and from activity location.
>
> **<u>SPORTING</u>** – restricts lawful possession to the purpose of lawful recreational
> shooting or competition; for use in the lawful pursuit of game animals and birds;
> for personal protection in the home; for the purpose of collecting (other than
> machine guns); and for outdoor recreational activities such as hiking, camping,
> cross country skiing, or similar activities.  Includes travel to and from activity
> location.

(Def. Ex. 4).

        Albertelli's policy is to issue unrestricted licenses to applicants only if the applicant can

show a "reason to fear." (Albertelli Dep. 33). Albertelli stated that in order to receive an

unrestricted license, the applicant must demonstrate "[n]ot a feeling of fear; I need a reason to

fear. Something had to happen in their life that they fear for their safety." (*Id.* at 33). According

to him, examples of people with a reason to fear include people who have been assaulted or

harassed, and people who are in professions that are inherently dangerous. (*Id.*). When asked at

his deposition whether there were other considerations relevant to Albertelli's determination, he

stated: "Could be. Depends what they tell me. I ask them to be very specific so that I can

evaluate it. That's my job." (*Id.*).

In practice, 89% of the firearm licenses granted to first-time applicants in Winchester

contain at least one restriction, principally the target and hunting restriction. (Pl. SMF ¶¶ 29–

35).[5] By comparison, only 5% of firearm licenses that are issued to applicants renewing their

licenses contain any restriction. (*Id.*).

### C. **Plaintiffs' Applications**

#### 1. **Jean Batty**

In 2013, Jean Batty lived in Winchester. On March 24, 2013, she applied to the

Winchester Police Department for a firearm license. (Def. Ex. 1). Batty had never previously

owned a firearm. (Batty Dep. 13). She contends that she applied for the license because she was

concerned about the possibility of terrorism and wanted a handgun for self-defense. (*Id.* 22–

---

[5] From January 1, 2014, through March 23, 2016, Albertelli issued a total of 252 firearm licenses. Of the 140 licenses issued to first-time applicants, 94 were issued with target and hunting restrictions, and an additional 31 were issued with a combination of restrictions. (Pl. SMF ¶¶ 29–35). Issuing a license with a combination of restrictions has the effect of broadening the purposes for which the license may be used; for instance, for target and hunting purposes as well as for employment purposes. By comparison, of the 112 renewal applications, five were issued with target and hunting restrictions, and one was issued with a combination of restrictions. (*Id.*). Of the 15 unrestricted licenses issued to first-time applicants, 2 were issued to law enforcement officers. (*Id.* ¶ 30). The others were issued to people from a variety of professions, including, among others, a physician, a horologist, a nurse, an attorney, and several retirees. (Firearms Records Bureau Report, Docket No. 60-1).

23).[6]  Her application stated that she was requesting the license for "all lawful purposes, personal protection and self-defense."  (Def. Ex. 1).  At the time of her application, she did not provide additional information demonstrating her need or motivation for seeking a license.

On June 5, 2013, Batty was issued a Class A unrestricted firearm license.  (Pl. SMF ¶ 6).  At the end of that month, she moved from Winchester to Scituate, Massachusetts, where she now resides.  (Id. ¶ 1).[7]  In January 2015, she received a letter from the Winchester Police Department informing her that she was required to exchange her unrestricted license for a restricted license.  (Batty Dec., Ex. 3).  The letter stated that she had been issued the license "without the approved Target and Hunting Restriction as originally directed by the Chief of Police," and directed her to return her Class A unrestricted license to be replaced with a Class A license that contained a target and hunting restriction.  (Id.).  On January 26, 2015, her husband, acting on her behalf, returned her unrestricted license to the Winchester Police and collected a new license that contained a target and hunting restriction.  (Pl. SMF ¶ 18).[8]

Shortly prior to exchanging the license, Batty's husband sent Albertelli a letter requesting that he reinstate her unrestricted license.  (Batty Dec., Ex. 4).  The letter stated that Batty works at MassHealth as a Disability Ombudsman, which requires her to assist people who may become

---

[6] In her deposition, Batty identified three incidents that gave rise to her desire for a handgun for personal protection against terrorism.  She stated that "[her] husband was at the Pentagon when it was hit [on September 11, 2001]. . . . [She] also lived in Washington, D.C., at the time of the sniper . . . [and she] was in North Station [in Boston] at the time of the Boston bombing with [her] child who uses a wheelchair to get around.  It's very hard to flee from terrorism when you're in a wheelchair."  (Batty Dep. 22–23.)

[7] During oral argument concerning this motion, counsel for plaintiffs represented that the electronic system used to issue licenses "will not allow another license to carry to be issued while a current one is [in] force," rendering it impossible for a license holder who has moved to petition a licensing authority in his or her new city or town to modify or reissue a license.  (Tr. 7:17–18).  Defendant has not raised any issue concerning plaintiffs' standing to challenge the Winchester licensing policy.

[8] Batty's husband was issued an unrestricted license at the same time that Batty was issued such a license.  (See Letter from D. Scott Batty, Jr. to Chief Ken Albertelli dated January 21, 2015, Docket No. 58-4).  He was also directed to exchange his unrestricted license for a license with a target and hunting restriction in January 2015.  (Id.).

distraught or confrontational when faced with an adverse decision. (*Id.*). The letter identified an individual whom she considered paranoid and caused her to be concerned for her safety. (*Id.*).

Batty was not reissued an unrestricted license. (Pl. SMF ¶ 20). She had not purchased a gun during the period that her license was unrestricted, and does not currently own one. (Batty Dep. 13).

### 2. **Edward Russo**

Edward Russo is also a resident of Winchester. On March 13, 2013, Russo submitted an application for a firearm license to the Winchester Police Department. He contends that there was no precipitating event that caused him to apply for the license. (Russo Dep. 8). When asked why he submitted an application, he stated, "[j]ust no reason whatsoever . . . nothing never happened to me." (*Id.*). Like Batty, he had never owned a gun, but requested the license "for all lawful purposes, personal protection." (Def. Ex. 6).

On June 5, 2013, Russo was issued a Class A unrestricted firearm license. (Def. Ex. 7). Around January 2015, he received a letter from the Winchester Police Department, similar to the one that was sent to Batty, requesting that he exchange his unrestricted license for a license with a target and hunting restriction. (Def. Ex. 4). On February 5, 2015, he exchanged his unrestricted license for a restricted license. (Pl. SMF ¶ 19).

Russo now lives in South Yarmouth, Massachusetts. (Russo Dec. ¶ 14).[9] He purchased a gun for the first time in 2016. (*Id.*)

### D. **Commonwealth Second Amendment, Inc.**

Plaintiff Commonwealth Second Amendment, Inc. is a Massachusetts-based non-profit corporation organized for the purpose of education, research, and legal action regarding what it

---

[9] Again, defendant does not raise any issue as to Russo's standing to challenge the Winchester policy.

contends is the constitutional right to possess and carry firearms. (Bolioli Dec. ¶ 3). Both plaintiffs Batty and Russo are members of Comm2A. (*Id.* ¶ 4). Because its standing relies on the standing of its members and because its claims appear to be essentially derivative of the claims of its members, the organization's claims can be decided on the same grounds as those of the individual plaintiffs without separate analysis. *See United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992).

### E.  Procedural Background

On January 30, 2015, plaintiffs Batty, Russo, and Commonwealth Second Amendment, Inc., brought this lawsuit against defendant Albertelli.[10]  Plaintiffs amended the complaint on March 11, 2015.

On July 7, 2016, defendant filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or, in the alternative, for summary judgment.  On July 8, plaintiffs filed a cross-motion for summary judgment.

## II.  Analysis

### A.  Cross-Motions for Summary Judgment

The two-count amended complaint alleges violations of the Second and Fourteenth Amendments under 42 U.S.C. § 1983.  To succeed on a claim under 42 U.S.C. § 1983, plaintiffs must prove that (1) the conduct complained of was carried out under color of state law and (2) defendant's actions deprived plaintiffs of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st. Cir. 2001).

There is no dispute that defendant Albertelli was acting under color of state law in issuing plaintiffs' restricted licenses.  The complaint alleges that Massachusetts's licensing scheme and

---

[10] The complaint also asserted the claims of three other plaintiffs involving other Massachusetts towns, all of which have been dismissed.

defendant's licensing policies violate the Second Amendment and the Equal Protection Clause by (1) permitting the imposition of "target and hunting" restrictions on their licenses and (2) allowing issuance of permits to turn on "arbitrary considerations, such as whether an individual resides on the correct side of a boundary line, has a lot of cash . . . or has held [a license] for some period of time." Am. Compl. ¶¶ 65–71. In essence, plaintiffs contend that the Second Amendment, as interpreted by the Supreme Court decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), protects the right of law-abiding citizens to carry handguns in public for the purpose of self-defense.[11]

Defendant contends that neither the Town's policy nor the statutory scheme implicates a Second Amendment right because that right is limited to personal protection within the home.

### 1. **Standard of Review**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896

---

[11] When plaintiffs applied for and received unrestricted Class A licenses, Class B licenses were also available. By the time that they were reissued restricted Class A licenses, Class B licenses were no longer available due to a 2014 statutory amendment. Neither party has argued that the proper framework for analysis is to examine whether the deprivation of the "additional benefits granted by an unrestricted Class A license, over and above those granted by a Class B license, amounted to a Second Amendment violation." *Hightower*, 693 F.3d 71. Because at the time plaintiffs were reissued restricted Class A licenses, they had no recourse to apply for unrestricted Class B licenses, the Court will treat the reissuance decisions as totally prohibiting plaintiffs from carrying handguns in public for the purpose of personal protection.

F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court

indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,*

994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is

made, the adverse party must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The non-

moving party may not simply "rest upon mere allegation or denials of his pleading," but instead

must "present affirmative evidence."  *Id.* at 256–57.

### 2.  **The Second Amendment**

The Second Amendment to the United States Constitution provides as follows:  "A well

regulated Militia, being necessary to the security of a free State, the right of the people to keep

and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In 2008, the Supreme Court

struck down a District of Columbia ordinance that prohibited the possession of handguns in the

home, declaring that the Amendment guarantees "the right of law-abiding, responsible citizens to

use arms in defense of hearth and home."  *Heller*, 554 U.S. at 635 (2008).  In 2010, the Court

affirmed that the "right to possess a handgun in the home for the purposes of self-defense" is

incorporated into the protections against infringement by the states provided by the Fourteenth

Amendment.  *McDonald*, 130 S. Ct. at 3050 (2010).  In *Heller*, however, the Supreme Court

qualified its holding, stating that "[l]ike most rights, the right secured by the Second Amendment

is not unlimited. . . .  [N]othing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings, or laws

imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27.

As the First Circuit has recognized, several circuits use a two-part framework to evaluate

11

a claim of Second Amendment infringement.  *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir.

2015).  Under that framework, courts

> first consider whether the challenged law imposes a burden on conduct that falls
> within the scope of the Second Amendment's guarantee as historically understood,
> and if so, . . . next determine the appropriate form of judicial scrutiny to apply
> (typically, some form of either intermediate scrutiny or strict scrutiny).

*Id.* (citing *Jackson v. City and County of San Francisco,* 746 F.3d 953, 962–63 (9th Cir. 2014);

*Drake v. Filko,* 724 F.3d 426, 429 (3d Cir. 2013); *Woollard v. Gallagher,* 712 F.3d 865, 874–75

(4th Cir. 2013); *Nat'l Rifle Assn'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*

*Explosives,* 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno,* 679 F.3d 510, 518 (6th

Cir. 2012); *Heller v. District of Columbia,* 670 F.3d 1244, 1252 (D.C.Cir. 2011) ("*Heller II*");

*Ezell v. City of Chicago,* 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Reese,* 627 F.3d

792, 800–01 (10th Cir. 2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010); *cf.*

*Kwong v. Bloomberg,* 723 F.3d 160, 167 (2d Cir. 2013); *United States v. Bena,* 664 F.3d 1180,

1182–85 (8th Cir. 2011); *United States v. Skoien,* 614 F.3d 638, 639–43 (7th Cir. 2010) (*en*

*banc*)).

Although the First Circuit has not explicitly adopted that two-step approach, the cases in

which it has directly analyzed Second Amendment issues appear to fall under either the first or

second step of the framework.  For example, in *United States v. Rene E.*, the court concluded that

the federal statute criminalizing firearm possession by juveniles did not violate the Second

Amendment because it was one of the "longstanding prohibitions" that *Heller* did not call into

question.  *See* 583 F.3d 8, 16 (1st Cir. 2009).  While the court in *Rene E.* did not specifically hold

that the statute only burdened conduct outside the scope of Second Amendment protection, the

analysis it followed was almost identical to those of other circuits when conducting the first step

in their Second Amendment analysis.  *Compare, e.g., Rene E.*, 583 F.3d at 13–16 (surveying

nineteenth-century state laws and the founders' attitudes on juvenile handgun possession) *with National Rifle Ass'n of Am.*, 700 F.3d at 200–204 (surveying founding-era attitudes and nineteenth-century opinion on juvenile firearm possession).

In *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) and *United States v. Armstrong*, 706 F.3d 1 (1st Cir. 2013), the First Circuit upheld a federal statute criminalizing firearm possession by persons convicted of misdemeanor crimes of domestic violence. In doing so, it found that the statute, although falling within one of the "presumptively lawful" categories of firearm regulation in *Heller*, required some form of means-ends scrutiny because it was a categorical limit on the Second Amendment right. *Booker*, 644 F.3d at 25; *Armstrong*, 706 F.3d at 7–8.

In *Hightower v. City of Boston*, the First Circuit concluded that revoking an individual's license to carry a concealed weapon based on the fact that her firearm license application contained a false statement did not violate the Second Amendment under any standard of heightened scrutiny. 693 F.3d 61, 76 (1st Cir. 2012). Thus, the analysis in *Booker*, *Armstrong*, and *Hightower* was similar to the analysis performed by other circuits at the second step of the Second Amendment analytical framework. *Compare Hightower*, 693 F.3d at 73–76 (regulation upheld under any standard of heightened means-ends scrutiny) *with Woollard*, 712 F.3d at 880–82 (regulation upheld under intermediate scrutiny).

Accordingly, the Court will first analyze the scope of the Second Amendment to determine whether the disputed target and hunting restriction imposes a burden on the right to keep and bear arms protected by the Second Amendment's guarantee as historically understood. Next, the Court will analyze what form of means-ends scrutiny the restriction must satisfy. Finally, the Court will apply the appropriate level of scrutiny to the restriction at issue.

a.  **Scope of the Second Amendment**

*Heller* specifically precluded from Second Amendment protection three categories of firearm regulation:  "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places, [and] laws imposing conditions on the commercial sale of arms."  554 U.S. at 626–27.  The court identified these laws as examples of "presumptively lawful" regulatory measures, while explicitly describing the list as non-exhaustive.  *Id.* at 627 n.26.  Courts have interpreted *Heller* as delimiting the scope of the Second Amendment, placing regulations that are sufficiently rooted in history and tradition as to rise to the level of "presumptively lawful" outside its protection.  *See, e.g., Rene E.,* 583 F.3d at 12.

Plaintiffs contend that the target and hunting restrictions imposed on their licenses do not comport with historical understandings of the Second Amendment right as interpreted by *Heller*. They contend that the Second Amendment squarely protects the right of law-abiding citizens to carry handguns in public for the purpose of self-defense, which defendant has infringed by requiring them to show a specific "reason to fear" in order to receive unrestricted licenses. Neither party has submitted any in-depth analysis as to whether the "reason to fear" requirement or "target and hunting" restriction are justified by historical precedent.  Like the Third Circuit in *Drake*, this Court is "not inclined to address this [issue] by engaging in a round of full-blown historical analysis, given other courts' extensive consideration of the history and tradition of the Second Amendment."  724 F.3d at 431.

It is now well-established "that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment."  *Hightower*, 693 F.3d at 72; *see also Powell*, 783 F.3d at 347.   However, *Heller* and *McDonald* were not intended to describe the full

14

scope of the Second Amendment right, and neither squarely addresses whether the Second Amendment right extends beyond the home. *See Heller*, 554 U.S. at 595 (finding that "the Second Amendment conferred an individual right to keep and bear arms," but also that the Second Amendment did not "protect the right of citizens to carry arms for *any sort* of confrontation"). As a result, the lower federal courts have wrestled with the questions of whether, and to what extent, the right protected by the Second Amendment extends beyond the home. *See Hightower*, 693 F.3d at 74 (describing the matter as a "vast *terra incognita*") (quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)). Twice, the First Circuit has declined to reach the issue of "the scope of the Second Amendment as to carrying firearms outside the vicinity of the home." *Hightower*, 693 F.3d at 72 n.8; *Powell*, 783 F.3d at 348 (quoting *Hightower*, 693 F.3d at 72 n.8).

Decisions from the other courts of appeals offer mixed guidance. The Second, Third, and Fourth Circuits have "assumed for analytical purposes" that the Second Amendment has some application outside the home, without deciding the issue. *See Powell*, 783 F.3d at 348 n.10; *see also, Drake*, 724 F.3d at 431; *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *Woollard*, 712 F.3d at 876. In contrast, the Seventh Circuit held that the "Supreme Court has decided that the [Second] [A]mendment confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). The Ninth Circuit originally agreed with the Seventh Circuit's analysis. *See Peruta v. County of San Diego*, 771 F.3d 570 (9th Cir. 2014). However, it recently reversed that decision upon rehearing *en banc*, and determined that although the Second Amendment does not encompass a right to carry a concealed weapon in public, "[t]here may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public."

15

*Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016).

No federal court of appeals has held that the Second Amendment does not extend beyond the home. *But see Williams v. State*, 10 A.3d 1167, 1169, 1177 (Md. 2011) (holding that a statute requiring a permit to carry a handgun outside the home "is outside of the scope of the Second Amendment" and stating that "[i]f the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly").

In *Hightower*, the First Circuit stated that "[i]t is plain that the interest . . . in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in *Heller*." 693 F.3d at 72.  Although *Hightower* did not consider the constitutionality of regulating the open carrying of weapons outside the home, the authority it cited did not distinguish between the two, suggesting that the operative distinction was whether the individual asserted his Second Amendment right outside or inside the home.  *See id.* (collecting cases for the proposition that "[c]ourts have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment.").

In short, precedent does not clearly dictate whether the Second Amendment extends to protect the right of law-abiding citizens to carry firearms outside the home for the purpose of self-defense.  In the face of this conflicting authority, the Court will heed the caution urged by the First Circuit that the Second Amendment is an area that "courts should enter only upon necessity and only then by small degree."  *Id.* at 74 (quoting *Masciandaro*, 638 F.3d at 475). Accordingly, the Court will follow the approach taken by the Second, Third, and Fourth Circuits, and assume for analytical purposes that the Second Amendment extends to protect the right of armed self-defense outside the home.  The remaining question is whether it survives the applicable level of constitutional scrutiny.

16

**b.  Level of Scrutiny**

Assuming without deciding that the target and hunting restriction at issue burdens the Second Amendment right, it must survive some form of means-ends scrutiny to be constitutional. *See Hightower*, 693 F.3d at 74 (regulation upheld "whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue."). Again, defendants contend that the Second Amendment does not apply outside of the home, so the law need only withstand rational-basis scrutiny. Plaintiffs contend that the Court should either not adopt a categorical standard of scrutiny or should use a strict scrutiny standard.

In *Hightower*, the First Circuit explicitly refrained from deciding what standard of scrutiny applied to the concealed-carry regulation. *Id.* In *Booker*, however, the court found that "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." 644 F.3d at 25.

*Booker's* language has been interpreted as a description of intermediate scrutiny. *See, e.g., Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 692 (6th Cir. 2016) (describing *Booker* as "applying the equivalent of intermediate scrutiny"); *Kachalsky*, 701 F.3d 93 n.17; *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 396 (D.P.R. 2012). Indeed, the normal definition of "intermediate scrutiny" is a showing that "the challenged classification is 'substantially related to an important government objective.'" *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). That definition is virtually indistinguishable from the standard used in *Booker*. In *Armstrong*, however, the First Circuit stated plainly that "this court has not adopted intermediate scrutiny as the appropriate type of review for a [Second Amendment] challenge such as Armstrong's." 706 F.3d at 8.

The regulation at issue in *Booker* and *Armstrong* was substantially different from the one in this case, perhaps necessitating a different level of scrutiny. However, the Second, Third, and Fourth Circuits have explicitly adopted the intermediate scrutiny standard when examining regulations burdening an alleged Second Amendment right to carry weapons outside the home. *Kachalsky*, 701 F.3d at 96; *Drake*, 724 F.3d at 436; *Masciandaro*, 638 F.3d at 470-71.[12] In reaching that conclusion, those circuits have carefully parsed the language of *Heller* and *McDonald*, noted the longstanding tradition of firearms regulation in this country, and made parallels to situations where different levels of scrutiny are applied in the First Amendment context.

For example, the Second Circuit in *Kachalsky* noted that "when analyzing First Amendment claims, content-based restrictions on noncommercial speech are subject to strict scrutiny while laws regulating commercial speech are subject to intermediate scrutiny." 701 F.3d at 94 (citation omitted). *Kachalsky* concluded that "applying less than strict scrutiny when the regulation does not burden the 'core' protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits." *Id.* The Third Circuit in *Drake* also analogized the Second Amendment to the First Amendment, concluding that intermediate scrutiny applied because strict scrutiny was only triggered when the core "right to possess usable handguns in the home for self-defense" was implicated. 724 F.3d at 436 (emphasis in original). Finally, the Fourth Circuit in *Masciandaro* noted that "as we move

---

[12] In addition, other circuits have used the intermediate scrutiny standard when evaluating other types of firearms regulations outside the "core" right of armed self-protection within the home. *See, e.g.*, *National Rifle Ass'n of Am.*, 700 F.3d at 205 (federal ban on sale of handguns to juveniles); *Heller II*, 670 F.3d at 1257 (gun registration laws); *Reese*, 627 F.3d at 802 (prohibition on firearms ownership by individuals subject to a domestic protective order). No court has applied strict scrutiny to regulations burdening Second Amendment restrictions outside the home, although the Seventh Circuit invalidated an Illinois law without applying a particular level of heightened scrutiny. *Moore*, 702 F.3d at 942.

outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."  638 F.3d at 470.  Because of the longstanding tradition of regulating the carrying of firearms in public, *Masciandaro* concluded those regulations need only satisfy intermediate scrutiny to survive constitutional challenge.  *Id.* at 471.

This Court agrees that intermediate scrutiny, or a related analogue, is the appropriate standard to assess the constitutionality of the target and hunting restriction.  That restriction explicitly allows for use of a firearm in defense of the home, and therefore only implicates an individual's ability to carry a firearm in public.  Because that interest is not at the "core" of the Second Amendment right recognized by *Heller*, analysis at a level of scrutiny lower than the strict scrutiny standard appears to be appropriate.  *See Hightower*, 693 F.3d at 72 ("It is plain that the interest . . . in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in *Heller*.").

However, because *Armstrong* plainly stated that the First Circuit has not yet adopted the intermediate scrutiny standard for Second Amendment challenges to firearm regulations, the Court will avoid using that specific label.  Instead, the Court's analysis will focus on whether defendant has shown a "substantial relationship between the restriction and an important governmental objective."  *Booker*, 644 F.3d at 25.

### c.  **Application**

"In reviewing the constitutionality of a statute, courts must accord substantial deference to the [legislature's] predictive judgments."  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quotation omitted).  "The Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of the courts."  *Kachalsky*, 701 F.3d

at 97 (citing *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010)).

As described, the Massachusetts firearm regulatory regime allows, but does not require, a local licensing authority to impose restrictions on firearm licenses that the authority "deems proper." Mass. Gen. Laws ch. 140, § 131(a–b). Massachusetts law further provides that a licensing authority "may issue" a license if the applicant either has a good reason to fear injury or "for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section." *Id.* § 131(d). Pursuant to that broad grant of authority, defendant has a policy of imposing target and hunting restrictions on first-time applicants who do not show a "good reason to fear injury" that distinguishes them from the general population.

The purpose of the licensing provisions of Mass. Gen. Laws ch. 140, § 131, is "to protect the health, safety, and welfare of [Massachusetts] citizens." *Chardin v. Police Com'r of Boston*, 465 Mass. 314, 327 (2013). Massachusetts undoubtedly has a substantial interest in promoting public safety and preventing crime. *See McCullen v. Coakley*, 571 F.3d 167, 178 (1st Cir. 2009) (evaluating whether restriction on free speech was "reasonably related to the legislature's legitimate public safety objectives"); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997) (noting "the governmental interest in public safety is clearly a valid interest"); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (describing "the [g]overnment's general interest in preventing crime" as "compelling"). The question is whether defendant's policy of imposing target and hunting restrictions on the licenses of first-time applicants who fail to show a specific "reason to fear" has a sufficiently substantial relationship to public safety to withstand constitutional scrutiny.

The New York licensing scheme considered by the Second Circuit in *Kachalsky* is

20

similar to the Massachusetts regulatory regime.  New York law generally prohibits citizens from possessing firearms without a valid license to carry.  *Kachalsky*, 701 F.3d at 85.  Several types of firearm licenses are available for individuals who work in certain types of employment.  *Id.* at 86.  The only license that allows the carrying of a handgun without regard to employment is New York Penal Law § 400.00(2)(f), which requires an applicant to demonstrate "proper cause" in order to receive a license.  *Id.*  Thus, individuals "who desire to carry a handgun outside the home and who do not fit within one of the employment categories [allowing handgun possession] must demonstrate proper cause pursuant to section 400(2)(f)."  *Id.*

Although "proper cause" is not defined in the statute, "the New York state courts have defined the term to include carrying a handgun for target practice, hunting, or self-defense."  *Id.*  Licenses that are issued for the purpose of target practice or hunting can be restricted to those purposes.  *Id.*  To establish proper cause to obtain an unrestricted license, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *Id.* (quoting *Klenosky v. New York City Police Dep't,* 428 N.Y.S.2d 256, 257 (N.Y. App. Div. 1980)).

Three of the plaintiffs in *Kachalsky* were granted licenses limited to the purpose of target shooting and sought to remove that restriction.  *Id.* at 88 n.7.  When the relevant licensing officers refused to do so, the plaintiffs filed suit, contending that the refusal to remove the restriction violated their right to armed self-defense outside the home and that New York could not force them to demonstrate proper cause to exercise that right.  *Id.* at 88.

After reviewing the legislative history of the New York licensing regime, the Second Circuit found that New York's decision to regulate the number of handguns in public "was premised on the belief that it would have an appreciable impact on public safety and crime

prevention." *Id.* at 98.  It concluded that "[r]estricting handgun possession in public to those

who have a reason to possess the weapon for a lawful purpose is substantially related to New

York's interests in public safety and crime prevention." *Id.*

As noted, the licensing regime in New York is substantially similar to the one challenged

in this case.  In New York, a first-time applicant can receive an unrestricted license if he or she

shows a special need for self-protection distinguishable from that of the general public.  *Id.* at 86.

By comparison, in Massachusetts, an applicant can receive a license if he or she shows "good

reason to fear injury to the applicant or the applicant's property or for any other reason, including

the carrying of firearms for use in sport or target practice only, subject to the restrictions

expressed or authorized under this section."  Mass. Gen. Laws ch. 140, § 131(d).  Although no

authority directly on point has interpreted the phrase "good reason to fear injury," Massachusetts

courts have made clear that without such a showing, restrictions can be placed on a firearm

license that limit the holder's ability to carry a firearm.  *See Ruggiero*, 18 Mass. App. Ct. at 261

(plaintiff's request for unrestricted license because he "is a potential victim of crimes against his

person" did not make the decision to deny him an unrestricted license arbitrary, capricious, or an

abuse of discretion); *Stanley v. Neilen*, 2003 WL 1790853, at *2 (D. Mass. Mar. 31, 2003)

(restriction on plaintiff's license because he "did not sufficiently demonstrate that he had good

reason to fear injury to his person or property—a requirement that has been part of the

Massachusetts gun licensing scheme since at least 1936" upheld).  In some respects, the

Massachusetts law is less restrictive than the New York law, because while in New York an

applicant must show a special need to obtain an unrestricted license, Massachusetts law permits,

but does not require, a licensing authority to demand applicants demonstrate a special need for

self-defense before being issued an unrestricted license.

Massachusetts adopted its licensing requirement "as a first-line measure in the regulatory scheme" as a result of the "realization that prevention of harm is often preferable to meting out punishment after an unfortunate event." *Ruggiero*, 18 Mass. App. Ct. at 258–59.  The requirement "was intended 'to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.'" *Id.* at 59 (quoting Rep. A.G., Pub. Doc. No. 12, at 233–34 (1964) (alteration in original)).  As in New York, the Massachusetts legislature decided "not to ban handgun possession, but to limit it to those individuals who have an actual reason . . . to carry the weapon." *Kachalsky*, 701 F.3d at 98.

To the extent that imposing a "target and hunting" restriction on an applicant who fails to show "good reason to fear injury" burdens conduct protected by the Second Amendment, that requirement is substantially related to the state's important objective in protecting public safety and preventing crime.  As other courts have found, "requiring a showing that there is an objective threat to a person's safety—a special need for self-protection—before granting a carry license is entirely consistent with the right to bear arms." *Kachalsky*, 701 F.3d at 100 (quotations omitted)*.  See also Woollard*, 712 F.3d at 880 ("there is a reasonable fit between the good-and-substantial-reason requirement and Maryland's objectives of protecting public safety and preventing crime") (quotations and alterations omitted"); *Drake*, 724 F.3d at 439-40 (the "justifiable need" standard is a "measured approach [that] neither bans public handgun carrying nor allows public carrying by all firearm owners; instead, the . . . [l]egislature left room for public carrying by those citizens who can demonstrate a 'justifiable need' to do so.").  In making those findings, courts have acknowledged the deference given to the legislature in matters of public policy.  *See, e.g., Kachalsky,* 701 F.3d at 99 ("It is the legislature's job, not ours, to weigh

conflicting evidence and make policy judgments.").  Although the empirical data may be less than conclusive, the government's regulation need only be "substantially related" to its important objectives to promote public safety and prevent crime in order to pass constitutional muster.  Instead of banning the carrying of firearms in public outright, the Massachusetts legislature has balanced the need to reduce the number of firearms in public with the needs of individuals who have a heightened need to carry firearms in public for self-defense.

In short, the policy that requires applicants to show a specific reason to fear in order to be issued unrestricted firearm licenses, and its authorizing statute, are constitutional.  The Court agrees in substance with the Second, Third, and Fourth Circuits, which have upheld similar requirements in other firearm-licensing regimes.  *See id.* at 100–01 (upholding "proper cause" requirement for unrestricted licenses in New York); *Drake*, 724 F.3d at 440 (upholding "justifiable need" requirement for licenses in New Jersey); *Woollard*, 712 F.3d at 881 (upholding "good-and-substantial reason" requirement for licenses in Maryland).  Those requirements, although phrased differently, are "essentially the same—the applicant must show a special need for self-defense distinguishable from that of the population at large, often through a specific and particularized threat of harm."  *Drake*, 724 F.3d at 442 (Hardiman, J., dissenting).  The courts analyzing these requirements have concluded that they are substantially related to the important governmental objective to promote public safety and prevent crime.[13]

---

[13] The Seventh Circuit's opinion in *Moore* is not to the contrary.  In *Moore*, the court considered a Second Amendment challenge to a "blanket prohibition on carrying [a] gun in public" in Illinois.  702 F.3d at 940.  In holding that prohibition unconstitutional, the court noted that "[r]emarkably, Illinois is the *only* state that maintains a flat ban on carrying ready-to-use guns outside the home."  *Id*.  The Illinois law had no exception for individuals who showed an objective, heightened need for a firearm for self-defense.  *Id*. at 934.  Indeed, *Moore* specifically noted that "[n]ot even Massachusetts has so flat a ban as Illinois."  *Id*.  Ultimately, the Seventh Circuit struck down the law, concluding that Illinois had failed "to justify the most restrictive gun law of any of the 50 states."  *Id*. at 941.  Even then, the court stayed its entry of judgment for 180 days to "allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public."  *Id*. at 942.  The logical inference is that the Seventh Circuit concluded that some limitation on the carrying of firearms is reasonable.  As *Moore* did not consider a restriction

Accordingly, the placing of target and hunting restrictions on the licenses of applicants who do not show good reason to fear injury is substantially related to the important governmental objective of public safety, and therefore does not violate the Second Amendment.

### 3. **Equal Protection Claim**

The amended complaint alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, contending that the Massachusetts regulatory regime, and in particular Mass. Gen. Laws ch. 140, § 131(a) and (d), restricts the ability of law-abiding citizens to bear arms based on arbitrary considerations. Neither party has developed arguments concerning the Equal Protection claim in the briefs concerning their cross-motions. However, like the Second Amendment claim, this issue is ripe for disposal on summary judgment. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Here, the classification does not impermissibly interfere with the exercise of a fundamental right, and there is no suspect class at issue. Thus, "[g]iven that the Second Amendment challenge fails, the Equal Protection claim is subject to rational basis review." *Hightower,* 693 F.3d at 83. For the same reasons that the regulatory regime is substantially related to the important governmental objectives of promoting public safety and preventing crime, it also survives rational basis review.

### B. **Motion for Judgment on the Pleadings**

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) "is treated much like a Rule 12(b)(6) motion to dismiss." *Perez-Acevedo v. Rivero-Cubano,* 520 F.3d 26, 29 (1st Cir.

---

that permitted individuals with a special need for self-defense to obtain unrestricted firearm licenses, it is of limited persuasive value.

2008).  To survive a motion for judgment on the pleadings, a plaintiff "must state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### 1. Exhaustion of State Remedies

Defendant's motion for judgment on the pleadings rests on the claim that plaintiffs failed to exhaust their state remedies before bringing an action in federal court.  However, it is well-established that a plaintiff need not exhaust state remedies before bringing claims under 42 U.S.C. § 1983 to challenge the constitutionality of state action.  *See, e.g., Rogers v. Okin*, 738 F.2d 1, 5 (1st Cir. 1984) ("A plaintiff alleging a cause of action under 42 U.S.C. § 1983 need not first exhaust state judicial remedies) (citing *Monroe v. Pape*, 365 U.S. 167, 183 (1961); *Martinez-Rivera v. Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016) ("[administrative] exhaustion is not a precondition to bringing a section-1983 claim in federal court") (citing *Patsy v. Bd. of Regents*, 457 U.S. 496, 501–502 (1983)).  Accordingly, defendant's motion for judgment on the pleadings will be denied.

## III.    Conclusion

For the foregoing reasons, defendant's motion for judgment on the pleadings and plaintiffs' motion for summary judgment are DENIED.  Defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: February 24, 2017

26